**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
———————————————————————

**OLENA MILITINSKA-LAKE,**

                              **Plaintiff,**

        **v.**                                                    **1:20-CV-443**
                                                                   **(TJM/CFH)**


**ELATISHA KIRNON, in her individual capacity as**
**Chief Diversity Officer for the Governor's Office**
**of Employee Relations (GOER), State of New York,**
**et al.,**

                              **Defendants.**
———————————————————————

**THOMAS J. McAVOY,**
**Sr. U. S. District Judge**

### DECISION & ORDER

        Before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint.

See dkt. # 22.  The parties have briefed the issues and the Court has determined to

resolve the matter without oral argument.

## I.      BACKGROUND

        This *pro se* civil action arises out of Plaintiff Olena Militinska-Lake's employment as

a Senior Auditor with the New York State Department of Public Service (DPS).  Amended

Complaint ("Amend. Cmplt."), dkt. # 7, at ¶ 12.  Plaintiff is a naturalized American citizen of

Ukranian origin.  Id. at ¶ 10.  She speaks fluent English, but her native languages are

Ukranian and Russian.  Id.  Plaintiff has advanced degrees in accounting, taxation, and

economics.  Id. at ¶ 11.  On November 9, 2018, a day after she received a 10-year

dedicated service award at a ceremony, Defendants informed Plaintiff that she had been suspended without pay for "acts of discriminatory conduct and the use of [a] racially discriminatory term." Id. at ¶¶ 14-15. That suspension has become a subject of this action.

Plaintiff alleges national origin discrimination over a period of years. She contends that on March 18, 2014 Jerry Shang Hongbing ("Shang"), "Plaintiff's co-worker of" a "higher Grade" who had "[s]upervisory responsibilities" and was "her prior and future" cubicle "neighbor, committed a brutal harassing attack on Plaintiff based on her national origin." Id. at ¶ 16. On that day, Plaintiff claims, Shang approached Plaintiff in a narrow corridor, blocked her exit, and starting making the signal for a time-out with his hands in front of Plaintiff's face. Id. "Time out!" he stated, "No discussion! [Y]ou are Ukranian, you must not like what Putin did in Ukraine, don't you? . . . I like it, because China supports Putin!" The Russian Federation had annexed Ukranian Crimea two days earlier. Id.

Plaintiff reported this incident as well as similar jokes made by another employee to Defendant Doris Stout, Director of the DPS Office of Accounting Audits and Finance ("OAAF"). Id. at ¶ 17. Neither Stout nor Human Resources took the matter seriously, even after Shang allegedly engaged in other harassment attempts. Id. Shang's conduct "deeply insulted" Plaintiff on a personal level, and she felt "even more insulted on behalf of all Ukranians, whose wound is very deep with that annexation and the following war." Id. Plaintiff also felt "insulted as a naturalized American, whose citizenship is also subjected to the Oath to America, its interests and constitution, not to China[.]" Id. Plaintiff also had family members in Ukraine, and she worried about them; "[h]arassing attacks from Mr. Shang . . . and adverse positions and actions of Management towards Plaintiff resulted in

2

stress" that caused Plaintiff to develop a "life-threatening health condition" that appeared in June 2014 and which "was finally diagnosed 09/11/2014." Id. at ¶ 18.[1]

Plaintiff contends that Defendant Stout soon "completely turned" Plaintiff's complaint against Plaintiff in a memorandum dated October 15, 2015. Id. at ¶ 19. Stout characterized Plaintiff's communication concerning Shang as a "'particularly hateful note apparently addressed at his Chinese roots[.]'" Id. Stout contended that Plaintiff's writing could be "'considered a form of harassment based on his ethnicity" that involved "'prohibited behavior.'" Id. Plaintiff alleges that she had reminded Stout "about the value of the Naturalization Oath, as prerequisite for citizenship, and" that "citizenship" was "a requirement for Government employment." Id. Rather than "properly relating" Plaintiff's "whistleblower efforts," were "legislatively protected," Stout instead "discussed her core defamatory Memo with Plaintiff at a counseling session with HR." Id. at ¶ 20. Plaintiff contends that Stout's actions represent retaliation for Plaintiff's report of harassment in violation of her Title VII, due process rights, and First Amendment rights. Id. at ¶ 21. Plaintiff contends that this October 29, 2015 memorandum led to "further discriminative developments and actions" that continue to the date she filed her Amended Complaint. Id. at ¶ 22. "[T]he deterioration of Plaintiff's career and existence in the Office began and her position on the Organizational Chart was frozen at the bottom." Id.

In early 2015, Plaintiff "was rotated out of" a "prestigious" job in the major utility sector. Id. at ¶ 23. This change in position came after OAAF's Deputy Director, Defendant John Scherer, in late 2014 rejected Plaintiff's "selfless work and significant findings in

---

[1]Plaintiff does not reveal this diagnosis.

major Utility's Sandy Storm audit." Id. at ¶ 23.  Scherer's actions came "at the time when"

Plaintiff "fought for her life with [a] threatening health condition, being considered disabled."

Id.

Despite this disability, which lasted from the second half of 2014 until the first half of

2015, Plaintiff worked on a number of "fruitful projects."  Id. at ¶ 24.  At the same time,

however, Plaintiff alleges that Defendants "were developing the destructive and defaming

retaliating activity against Plaintiff, complicating Plaintiff's fight for life against [a] life-

threatening health condition."  Id. Making all inferences in Plaintiff's favor, she appears to

contend that between 2015 and 2017, "multiple Memo, emails, and notes, originated,

encouraged or suggested by OAAF and HR management," alleged that Plaintiff had

engaged in improper behavior.  Id.  These documents, Plaintiff claims, contradicted

themselves, and "flooded the Plaintiff's profile leading to multiple counseling of Plaintiff and

two Interrogations."  Id.  Plaintiff alleges that the Directors of HR and OAAF, as well as the

Deputy Director of OAAF, "fabricated defamatory 'evidences' and subjected Plaintiff to

disgraceful psychological evaluation at Employees Heath Service (ERS) with projected

unpaid 1-year Leave of absence then potential further termination."  Id.  These efforts did

not succeed, but Plaintiff avers that such "mentally harassing activity continued until" she

"proved to HR that those actions constitute . . . discrimination and harassment and

requested HR to open [an] investigation[.]"  Id.

An investigation opened by HR in 2017 did not end in Plaintiff's favor.  Id. at ¶ 25.

Plaintiff claims that the investigator limited his inquiry "only to the latest 2016 promotion

and was looking for harassment's signs in discrimination matters."  Id.  This effort, Plaintiff

alleges, was "elementally doomed to failure."  Id.  The investigator "ignored the facts,

reported by Plaintiff, of some promotions of co-workers without any superiority of education, experience, or work achievements" Id.  Plaintiff alleges that promotions occurred because of friendships.  Id.  Shang, for instance, had "common hobbies" with the Deputy Director, Scherer.  Id.  The two may also be neighbors.  Id.  Plaintiff witnessed poor quality work from Shang, as well as hearing long conversations between Sheng and another person in a foreign language that violated workplace rules.  Id.  Another supervisor gave a promotion to a woman with whom she frequently had lunches.  Id.  This "lunch-friend" did poor-quality work and still received a promotion.  Id.  These promotions came even though no one in Plaintiff's unit had Plaintiff's education or skills.  Id.

Beginning in late 2014 and through 2017, Plaintiff informed the management team about errors in some calculation methods and proposed an alternative method that was a "math-proven, automated, multi-year," and "visualized Model with charts" as an additional aid.  Id. at ¶ 26.  Defendant Scherer "unreasonably abusively rejected Plaintiff's proposal and forbade any talks about her proposed and already used Model in analogous, Earnings Compliance, calculations."  Id.  In late 2015, Plaintiff "was moved" from "rate cases, mainstream knowledge and promotions" to a lower priority sector.  Id.  Questions about Plaintiff's new area of work "never appear on promotional exams," making it harder for Plaintiff to gain a promotion.  Id.  "Plaintiff was rejected" for promotion in 2015, 2016, 2017, and 2018.  Id.

While management refused to adopt Plaintiff's model when she suggested it, Plaintiff alleges that Shang obtained approval to use Plaintiff's model in staff training for earnings compliance in 2017.  Id. at ¶ 27.  Using this system helped advance Shang's career.  Id.  Plaintiff used her May 15, 2018 annual assessment "to inform MT and PSC

5

Chair about mismanagement, inappropriate promotions, discriminative misappropriation of work results, detrimental to PSC personnel[.]" Id.  Plaintiff contends that her calculation model was better than the one that Shang presented.  Id.  Still the management team "condemned her report in her 2019 Annual Assessment in negative 'Scription', in violation of retaliation and whistle blower protection rights."  Id.

Plaintiff reported a "significant flaw" in audit methodology in early 2018.  Id. at ¶ 28. The prior Account Executive Auditor had used that methodology for the previous 7 years and had been "promoted successfully out of it."  Id.  The methodological flaw "inhibited any meaningful Audit findings."  Id.  The flaw appeared in a re-opened audit and drew the attention of a Special Auditor, which found a "substantial deficiency."  Id.  Three prior auditors had missed the deficiency.  Id.  Faced with this deficient audit, the OAAF Director told Plaintiff to fix the audit in two to three weeks. Id. at ¶ 29.  Previous auditors had been unable to solve the problem, even though they had a great deal more time to do so.  Id. Shortly before the end of the assigned period, Plaintiff informed management that she had concluded that a serious deficiency existed.  Id.  Three days before the audit was to be completed, "Plaintiff was suddenly suspended from work with attempted termination without any attempts from management to secure and transfer of" Plaintiff's "work to somebody else."  Id.  Plaintiff alleges that these facts show that the purpose of assigning her the task was not to solve the problem, but to "harass" Plaintiff with "time pressure."  Id. Plaintiff alleges that such behavior amounts to discrimination and retaliation.  Id.

In January 2017, Shang moved to a cubicle near Plaintiff's.  Id. at ¶ 30.  Shang had received more supervisory responsibilities, had begun to oversee more subject matters, and had become an "unofficial" account executive auditor for a major utility.  Id.  Plaintiff

noticed that when Shang had phone conversations with someone from the utility he oversaw he switched to another language, "most likely [his] native language." Id. Once Shang appeared to be speaking to a particular utility executive on the phone "he became pronouncedly friendly in his language." Id. Shang used the names of people in the office, and, speaking his own language, "was laughing and giggling." Id. Shang also used "professional terminology and again his own language." Id. Conversations with utilities, Plaintiff claims, are "very restrictive," since "DPS work is confidential until it is made public." Id. at ¶ 32.

At some point, Plaintiff heard Shang tell a colleague that he would tape Plaintiff's conversations in Russian. Id. at ¶ 33. Plaintiff alleges that this statement "was discriminative and harassing[.]" Id. Plaintiff had no one with whom she could speak about business in Russian. Id. The colleague did not attempt to stop Shang from speaking in Chinese, or warn him not to engage in such conduct. Id. Plaintiff contends that management acted in a very "permissive" way toward Shang and very "restrictive" way towards her. Id. Such different treatment, she claims, "evidences the mismanaging and discrimination" that violated her rights. Id.

Plaintiff alleges that a dispute occurred between her and managers about whether languages other than English could be spoken at the workplace. Id. at ¶ 34. When Plaintiff raised the issue to Scherer, he "responded with [a] citation: 'speak English at all times in [the] workplace may be national origin discrimination[.]'" Id. at ¶ 35. Scherer then "abruptly [and] disrespectfully ended [the] conversation with [a] request not raise this subject with him at any time again." Id. He told Plaintiff that if she "need[ed] more clarification," she should "talk to HR." Id. Plaintiff alleges that Scherer had told her in 2013

7

that she should not speak in a language other than English in the office, even during a private conversation during lunchtime. Id. at ¶ 36. Plaintiff appears to allege that conversations between auditors and auditees in a language other than English violates public policy and auditing standards by creating an improper relationship between those persons. Id. at ¶ 37. Such conversations, she claims, also potentially violate New York ethics law by creating a suspicion of favoritism. Id. at ¶ 38. Shang and the person from the utility he audited frequently spoke together in a friendly way in a language other than English. Id. at ¶ 39. Plaintiff claims these conversations violated laws restricting business language to English at PSC, violated confidentiality rules, and undermined public trust in the office. Id.

Plaintiff informed the PSC Chairman, ethics officer, HR director and her supervisor about her concerns on May 21, 2018. Id. at ¶ 40. About a month later the Ethics Officer distributed a reminder about the organization's confidentiality policy and rules on communications with utilities. Id. at ¶ 41. While no other responses occurred, Plaintiff noticed that Mr. Shang's conversations stopped, and she "understood" this "as a positive reaction on the reminder." Id.

Plaintiff alleges that Shang's "active and loud friendly communication with" a person from an audited utility resumed later in September 2018. Id. at ¶ 42. On October 23, 2018 Shang engaged in a conversation that "became longer and louder." Id. Plaintiff sent a supervisor an email to remind him of the distribution from the Ethics Officer and their earlier discussion about these "secret talks." Id. Plaintiff included the OAAF director on the email. Id. This supervisor called Plaintiff to his cubicle and told her that she misunderstood the policy. Id. at ¶ 43. The Supervisor claimed that Shang was not required to speak English.

8

Id.  He did so as a favor to Plaintiff, but was free to decline to do so.  Id.

Shang returned to his cube, "apparently after talking with [the] Deputy Director[.]" Id. at ¶ 44.  He called the executive from the audited company, speaking in English.  Id. at ¶ 44.  Shang apologized "for his English," stating "I need to speak English now, because in the neighboring cube she complained about me and will complain again and all[.]" Id. Shang then used "abusive language" before continuing his "professional conversation."  Id. Plaintiff sent an immediate messages to supervisors in an effort to put a stop to an "unprofessional conversation[.]" Id. at ¶ 45.  She anticipated that someone "would come over and stop Mr. Shang, but there was no reaction."  Id.  Instead, she heard Shang on the telephone complaining about her for about ten minutes, using vulgar language that referred to her Ukranian heritage.  Id. at ¶ 46.  Plaintiff felt "shock, perplexity, confusion" when she heard Shang speaking, and spoke to her supervisor about Shang's comments.  Id.  The supervisor told her he had heard Shang and reported the conversation to the management team.  Id.

On October 25, 2018, frustrated that management had done nothing to address the "harassing phone conversation," Plaintiff reported the incident to "top management."  Id. She informed HR, the Ethics Officer, the PSC Chair and Deputy Chair about what she had heard, "begging for her safety, as the rage of Mr. Shang [was] only increasing towards her since 2014."  Id. at ¶ 47.  She received no response.  Id.

Instead, Plaintiff alleges, she received an invitation to a "counseling session" with Human Resources on October 30, 2018.  Id. at ¶ 48.  Despite the discriminatory and harassing language Plaintiff had reported, she "was accused again in Mr. Shang's discrimination."  Id.  The OAAF Director also "unreasonably condemned her recent work."

9

Id.  Plaintiff contends that the Director had not provided her sufficient time to complete the work, and "Plaintiff was very proud of her work," which she completed quickly, even though the work was difficult.  Id.  Three auditors who worked at a higher grade had been unable to complete the work for the previous six years.  Id.  Plaintiff's supervisor had approved her work on this audit, but the Director ignored these successes and ignored Plaintiff's explanation for the length of time she had spent on the project.  Id.

Plaintiff alleges that the Director ignored her explanations and "kept repeating '[j]ust wrap it up!'"  Id.  Eventually, "Plaintiff's nerves broke, and she summarized the discriminative and harassing attitude towards her by management and said: 'I am НЕГР on plantation in this Office[.]"  Id.  Plaintiff contends that she intended to reference the "historical meaning of brutality of slavery of historical time, extrapolating it on herself."  Id.  Those in the room responded with "complete silence," and Plaintiff realized that "something might be not as expected or not correct[.]" Id. at ¶ 49.  Plaintiff suspected that those in the room did not like her using the word "НЕГР," which is a Russian word that she understood to be "official and polite in her former country," but which "sounds close to" the "N-word."  Id.  In the alternative, Plaintiff thought, those in the room may have disliked her use of the word plantation, but she had heard that word used on national television by Omarosa, a "Trump associate, when she was escorted from the Office[.]"  Id.  Plaintiff thought she was using a proper "historical analogy."  Id.  Plaintiff explained to the other people in the office that "[t]his was the history of this country,'" meaning that she had simply offered a "historical reference, no underlying meaning."  Id.

At that point, the meeting had gone a half-hour past its scheduled ending, and Defendant Christine Balleau, Director of Human Resources for DPS, stated that the

meeting needed to end.  Id.  Balleau told Plaintiff that she would forward Plaintiff links she had requested for "Affirmative officers for [a] Discrimination complaint."  Id.  Balleau never sent the links, but instead prepared a suspension letter.  Id.

Plaintiff was suspended on November 9, 2018.  Id. at ¶ 50.  She returned to work on May 20, 2019, after an arbitrator returned her to her position.  Id.  The arbitrator concluded that the suspension was not supported by just cause and violated the union agreement in place at Plaintiff's workplace.  Id.  The arbitrator did not consider Plaintiff's claims of harassment and retaliation, as such issues were outside the scope of the agreement.  Id. Plaintiff received back pay for all but five days of her suspension.  Id. at ¶ 51.  Plaintiff contends that this suspension violated her First Amendment and due process rights.  Id. She also alleges that the suspension amounted to racial and national origin discrimination. Id.

Plaintiff contends that the expression she used referred to Plaintiff herself.  Id. at ¶ 52.  She was "feeling deep moral pain from long-term harassment and discrimination," and "public disgrace," which "culminated in suspension."  Id.  She did not intend to insult anyone.  Id.  She used the language in a private meeting with two white women, and the language therefore "cannot be construed as derogatory language[.]"  Id.  Moreover, the word "НЕГР," said in Plaintiff's native language, reflects a "national mentality, developed differently in different historic, religious, educational traditions of" Ukraine, a country that did not experience race-based slavery.  Id. at ¶ 53.  Indeed, she claims, Russians in the past–like Peter the Great–enjoyed a reputation for treating dark-skinned people well.  Id. During the existence of the Soviet Union, Plaintiff claims, that nation attracted African American immigrants, who were a source of pride in the USSR "and core propaganda

11

against America with its racial intolerance." Id. Given this cultural and historical background, Plaintiff claims, her use of the term "НЕГР plantation" was not intended as discriminatory. Id. at ¶¶ 54-55. Plaintiff used the term "as a reproof for bad treatment of Plaintiff now as it was then at historical times. It was a bad treatment, not a bad person meaning." Id. at 55. Defendant Kirnon, Plaintiff alleges, supported her suspension because of Plaintiff's race, which is different than Kirnon's. Id. at ¶ 57. Plaintiff also insists that she did not engage in any discriminatory conduct, and that any allegations that she did so amount to defamation. Id. at ¶ 59.

Plaintiff's Amended Complaint raises four causes of action. Count One raises claims against Defendants Doris Stout and John Scherer pursuant to 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, New York Executive Law § 296, New York civil Service Law § 75-b, and a common–law defamation claim. Plaintiff's Section 1983 claim alleges that Defendants violated her First Amendment rights. She further alleges that Defendants discriminated against her on the basis of her race and national origin. Count Two, raised against Defendants Doris Stout, John Scherer, Christine F. Balleau, Roger Halbfinger, Thomas Congdon, and Elatisha Kirnon, raises due process claims pursuant to 42 U.S.C. § 1983, Title VII claims, and claims for defamation. Count Three alleges that Defendants PSC and DPS violated Plaintiff's due process rights and rights pursuant to Title VII. Count Four raises the same claims against the State of New York.

Defendants have filed a motion to dismiss, and the parties have briefed the issues. The matter is ripe for disposition.

## II.    LEGAL STANDARD

Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(5) for

failure of service and Rule 12(b)(6) for failure to state a claim upon which relief could be granted.

### A. Lack of Service

Federal Rule of Civil Procedure 12(b)(5) permits a defendant to move to dismiss a complaint for "insufficient service of process."  Fed. R. Civ. P. 12(b)(5).  "'Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint.'" Koulkina v. City of New York, 559 F.Supp. 2d 300, 310 (S.D.N.Y. 2006) (quoting Sunrise Indus. Joint Venture v. Ditric Optics, Inc., 873 F.Supp. 765, 769 (E.D.N.Y. 1995).  When a court considers whether a complaint has been served as required by the federal rules, the court "'must look to matters outside the complaint to determine whether it has jurisdiction.'" Id. at 311 (quoting Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F.Supp.2d 382, 387 (S.D.N.Y. 2002)).  "'Conclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served with process.'" Mende v. Milestone Tech., Inc., 269 F.Supp.2d 246, 251 (S.D.N.Y. 2003) (quoting Howard v. Klynveld Peat Marwick Goerdeler, 977 F.Supp. 654, 658 (S.D.N.Y. 1997).  The plaintiff has the burden to prove adequate service when challenged.  Id. (citing Preston v. New York, 223 F.Supp.2d 452, 466 (S.D.N.Y. 2002); see also, Burda Media, Inc. v. Viertel, 417 F.3d 292, 298 (2d Cir. 2005)).

### B. Failure to State a Claim

Defendants have filed a motion to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendants argue that Plaintiff has not stated a claim upon

which relief could be granted, even if all factual allegations in the complaint were proved true.  In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).  When, as here, the Plaintiff proceeds *pro se*, the Court must "'construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.'"  Weixel v. Bd. of Educ. of N.Y., 287 F.3d 138, 146 (2d Cir. 2002) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000)).

## III.   ANALYSIS

Defendants raise a number of grounds in their motion, which the Court will address in turn, as appropriate.

### A.   Service

Defendants first contend that Plaintiff has not served Defendants Stout, Scherer, Congdon, and Balleau as required by Federal Rules of Civil Procedure 4(c).  Because of this lack of service, Defendants claim, the Court has not acquired personal jurisdiction over those Defendants, and must dismiss the Amended Complaint as to them.  Plaintiff disputes that she has failed to serve the Defendants.

Defendants Stout, Scherer, Congdon, and Balleau provide affidavits regarding

14

service.  Defendant Stout avers that she has a place of business at Empire State Plaza in

Albany, New York.  <u>See</u> Affidavit of Doris Stout, dkt. # 22-3, at ¶ 4.  Stout further relates

that "on or about June 24, 2020, the Summons and Amended Complaint in this action were

delivered to the home address of John Graham, an employee of DPS," who resides in

Brunswick, New York.  <u>Id.</u> at ¶ 5.  Stout states that she was never personally served with

the summons and Amended Complaint, and she never received those documents in the

mail at her residence.  <u>Id.</u> at ¶ 6-7.  She also never received those documents by mail at

her workplace.  <u>Id.</u> at ¶ 8.  Defendants John Scherer, Thomas Congdon, and Christine

Balleau provided nearly identical affidavits.  <u>See</u> dkt. #s 22-4, 22-5, 22-6.

Plaintiff responds that she hired a service company, which served Stout, Scherer,

Balleau, and Congdon on June 25, 2020.  <u>See</u> Plaintiff's Brief in Opposition, dkt. # 29, at ¶

36.  Plaintiff claims that John Graham was authorized to accept service on behalf of PSC

and DPS and its employees at his home address.  <u>Id.</u> at ¶¶ 37, 40-31.  During that time,

Plaintiff claims, the pandemic had closed PSC and DPS to the public and employees.  <u>Id.</u>

Plaintiff promises to provide an "explanation" from the company hired to serve Defendants.

<u>Id.</u>

Plaintiff filed affidavits of service of the summons and Amended Complaint on each

of the moving Defendants.  Those affidavits indicated that the process server delivered the

summons and Amended Complaint to 8 Golden Eagle Ct., Brunswick, NY, leaving them

with John Graham, an assistant attorney, "a person of suitable age and discretion who

agreed to accept on behalf of the party."  <u>See</u> dkt. #s 14-4 (Christine F. Balleau); 14-5

(John Scherer); dkt. # 14-6 (Doris Stout); 14-7 (Thomas Congdon).  Plaintiff also provided

affidavits of service by mail.  These documents indicated that Plaintiff served the moving

defendants "by depositing a copy of the aforementioned documents in a postpaid, properly addressed envelope, the address for the recipient being: 8 Golden Eagle Ct., Brunswick, NY." See dkt. #s 15-3 (Thoms Congdon); dkt. # 15-4 (Christine F. Balleau); dkt. # 15-5 (John Scherer); dkt. # 15-6 (Doris D. Stout).  Those affidavits indicated that mailings were directed "C/O Asst. Counsel John Graham." Id.

"[Federal] Rule [of Civil Procedure] 4(e) generally provides that individuals may be served by either (1) following the relevant state law procedures for service of the State where the district court is located or where service is made, or (2) personal delivery, leaving a copy at the individual's dwelling or usual abode with a person who resides there, or delivering a copy to an agent authorized to receive process." Vidurek v. Koskinen, 789 Fed. Appx. 889, 893 (2d Cir. 2019) (citing FED. R. CIV. P. 4(e)).  New York law provides several ways by which an individual can be served.  New York permits service "by delivering the summons within the state to the person to be served."  NY CPLR § 308(1). A person may also be served "by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business[.]" NY CPLR § 308(2).  New York also allows service "by delivering the summons within the state to the agent for service of the person to be served as designated under rule 318[.]" NY CPLR § 308(3). Section 318 provides that "[a] person may be designated by a natural person, corporation or partnership as an agent for service in a writing, executed and acknowledged in the same manner as a deed, with the consent of the agent endorsed thereon."  NY CPLR § 318.

16

The Court finds that Plaintiff has not met her burden to show that service was adequate for these Defendants in their individual capacities.  There is no dispute that they were not personally served.  While an agent did deliver the documents to an address and leave them with a person, that address was not the home of any of the Defendants. Plaintiff has provided no evidence that John Graham was the agent for service of any of the Defendants.  Plaintiff thus has failed to meet her burden with respect to Federal Rule of Civil Procedure 4(e)(2).[2]  Plaintiff could also serve her Amended Complaint by following New York law.  See Fed. R. Civ. P. 4(e)(1).  She has not met her burden in this respect. She did not deliver the summons and complaint to Defendants' places of business, nor did she mail those documents to Defendants' last known residences.  She likewise has not shown that Graham was the agent for service of any of these individuals.

The Court will therefore grant the motion to dismiss of Defendants Balleau, Congdon, Scherer, and Stout in their individual capacities.  As a result, only Defendant Kirnon remains as an individual defendant in this matter.

### B.    Section 1983 Claims Against OSC and PSC

Defendants next argue that Plaintiff's Section 1983 claims against OSC and PSC should be dismissed because those organizations are state entities entitled to sovereign

---

[2]A person may be served in any judicial district in the United States by:
 (2) doing any of the following:
>   (A) delivering a copy of the summons and of the complaint to the individual personally;
>   (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
>   (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.
Fed. R. Civ. P. 4(e)(2).

immunity.

"The Eleventh Amendment provides that 'the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against the United States by Citizens of another Sate, or by Citizens or Subjects of any Foreign State.'" Dube v. State University of New York, 900 F.2d 587, (2d Cir. 1990) (quoting U.S. Const. amend. XI). Federal courts also lack jurisdiction to hear suits brought by citizens against their own states. Id. (citing Dwyer v. Regan, 777 F.2d 825, 835 (2d Cir. 1986)). While Congress has the power to "override Eleventh Amendment immunity" under some circumstances, "it is well settled that 42 U.S.C. § 1983 does not constitute an exercise of that authority." Id. (quoting Fitzpatrick v. Blitzer, 427 U.S. 445, 456 (1976)). Thus, "'in the absence of consent[, any claims against] the State or one of its agencies or departments . . . [are] proscribed by the Eleventh Amendment.'" Id. (quoting Pennhurst State School and Hosp. v. Halderman, 465 U.s. 89, 100 (1984)). A Plaintiff cannot sue a state agency for damages pursuant to 42 U.S.C. § 1983.

Since OSC and PSC are state agencies, Plaintiff seeks damages from them, and the State has not waived immunity, they are entitled to sovereign immunity for any claims brought pursuant them to Section 1983. The Court will grant the Defendants' motion in this respect as well.

### C. Title VII Claims Against Individual Defendants

Defendants next seek dismissal of any claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), against the individual Defendants. They argue that such claims are unavailable as a matter of law. Plaintiff responds that the law is not clear about individual liability under Title VII.

18

Plaintiff is mistaken.  The Second Circuit Court of Appeals is clear that "an individual defendant cannot be held liable under Title VII."  Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 n.8 (2d Cir. 2006) (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1313-14 (2d Cir. 1995)).  As such, the Court will grant the motion with respect to any claims under Title VII against the individual Defendants.

### D.    Title VII Claims Against the Organizational Defendants

Defendants next argue that Plaintiff has failed to state any Title VII claims against the organizational Defendants, OSC and PSC.  Defendants first argue that Plaintiff cannot bring a Title VII claim against either Defendant, as they were not her employer.  Even if Plaintiff could bring such a claim against Defendants, they contend that Plaintiff did not file a timely discrimination charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the discrimination she faced, and therefore cannot maintain a claim.  Even if Plaintiff had met the 300-day time limit, Defendants insist that she has failed to alleged facts sufficient to meet her pleading burden.  Plaintiff responds that she recognizes that she has no claims against OSC and drops all claims that organization.  As to the time-bar for her claim against PSC, Plaintiff notes that EEOC accepted her filing and contends that the continuing violation doctrine makes her filing timely.

Defendants argue in part that Plaintiff cannot raise a Title VII claim against either OSC or PSC because neither organization employed her.  Plaintiff agrees that she cannot bring claims against OSC and states that she 'wants to drop all the issues related to OSC."  The Court will therefore grant the motion with respect to OSC and dismiss that Defendant from the case.  Plaintiff does not address whether she was a PSC employee at the time in question.  Her Amended Complaint alleges that she "was appointed to a position of Senior

19

Auditor, salary Grade 18, at D[epartment of]P[ublic]S[ervice], Defendant, on April 23, 2009. Amend. Complt. at ¶ 12. Plaintiff also attaches the arbitrator's decision to her Amended Complaint. That opinion states that "Olena Lake . . . is employed as a Senior Auditor in the accounting, audit and finance unit within the New York State Department of Public Service. [Plaintiff] audits public utilities doing business in the State of New York. The Grievant has been employed in the Department since 2009 and has received no prior discipline." See dkt. # 7-1, at 2.

As a general rule, the proper defendant in a Title VII case against a State entity is the actual department or agency that employs the Plaintiff. See, e.g., Trostle v. New York, No. 1:13cv709, 2016 U.S. Dist. LEXIS 38170, at *20=21 (N.D.N.Y. Mar. 24, 2016). The parties appear to agree that, at this time, Department of Public Service, Plaintiff's employer, is not a Defendant in this matter. Since Title VII claims are to be raised against a plaintiff's employer, there is no proper Title VII Defendant in this case. Any opinion that the Court would issue on the Title VII clams would be an advisory one. The Court will therefore grant the motion to dismiss is this respect. The motion will be granted without prejudice to Plaintiff filing an Amended Complaint that names her employer, DPS, as a Defendant.

### E.    First Amendment

Defendants next seek dismissal of any claims Plaintiff brings pursuant to the First Amendment. They argue that Plaintiff has failed to allege that she spoke as a citizen on a matter of public concern, and therefore cannot make out a claim.

The Court will not render any opinion on the motion in this respect. The Court has dismissed the case against the only Defendants named on this count, Doris Stout and

John Scherer.  The Court does not have jurisdiction to hear the claim.  The Court does not render advisory opinions and will offer no view on whether Plaintiff has here stated a claim.

### F.    Fifth and Fourteenth Amendments

Defendants next contend that the Court should dismiss any due process claims Plaintiff brings pursuant to the Fifth and Fourteenth Amendment.  Defendants insist that Plaintiff has not alleged that she possessed a protected property interest of which she was deprived.  They also contend that Plaintiff has not alleged that any individual Defendants had personal involvement in depriving her of these rights.  Plaintiff responds by explaining that she was qualified for the positions for which she sought promotion, and that others who were less qualified received promotion.  She does not address the legal standards for these claims.

The parties here appear to agree that Plaintiff attempts to raise a procedural due process claim.  Such a claim requires a showing that Plaintiff "'possessed a protected liberty or property interest, and that [she] was deprived of that interest without due process.'"  McMenemy v. City of Rochester, 241 F.3d 279, 286 (2d Cir. 2001) (quoting Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir. 1998)).   The due process clause does not itself create property interests: "'[s]uch property interests are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"  Id. (Luck v. Mazzone, 52 F.3d 475, 477 (2d Cir. 1995)).  Such interests are not just hopes or "'desires'" for the property.  Id.  (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)).  A plaintiff must "'have a legitimate claim or entitlement to it.'"  Id. (quoting Roth, 408 U.S. at 577).

Plaintiff fails the first part of this test and cannot maintain her claim.  Courts are clear

21

that "[i]n general, the nature and contours of a specific property interest are defined by some source independent of the Constitution–most often state law." Ezekwo v New York City Health & Hosp. Corp., 940 F.2d 775, 782 (2d Cir. 1991).  In New York, "a civil servant seeking a promotion 'does not possess any mandated right to appointment or other legally protectible interest.'" McMenemy, 241 F.3d at 286 (quoting Cassidy v. Mun. Civ. Serv. Comm'n, 37 N.Y.2d 526, 529 (N.Y. 1975)).  Since the deprivation Plaintiff complains about is the State's failure to promote her, she has not alleged deprivation of a protected property interest.  She cannot maintain a due process claim, and the Court will grant the motion to dismiss in this respect as well.

These claims are dismissed with prejudice as well, as Plaintiff could not plausibly allege facts which would allow her to prevail.

### G.   Executive Law § 296

Defendants next argue that Plaintiff cannot maintain a claim pursuant to New York Executive Law § 296 for discrimination on the basis of her national origin.  Such claims, Defendants claim, apply the same standard as claims under Title VII.  Since she failed to state a Title VII claim, she must also therefore have failed to state a claim under New York law.

The Court of Appeals has "repeatedly noted that claims brought under New York State's Human Rights Law [Executive Law § 296] are analytically identical to claims brought under Title VII." Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d. Cir. 1997) (citing Van Zandt v. KLM Royal Dutch Airlines, 80 F.3d 708, 714-715 & n.6 (2d Cir. 1996)).

The motion is granted without prejudice with respect to these claims for the reasons stated above in reference ot the Title VII claims.

### H.    Other State Law Claims

Finally, Defendants argue that the Court should dismiss Plaintiff's claim under Civil Service Law § 75-b and her defamation claim.  They first argue that the Court, having dismissed Plaintiff's federal claims, should decline to exercise supplemental jurisdiction over these state-law claims.  In the alternative, they argue that Plaintiff has failed to state a claim under the Civil Service law and that the statute of limitations has run on her defamation claim.   Plaintiff disputes Defendants' argument with respect to the Civil Service Law, but does not address Defendants' argument regarding the statute of limitations on her defamation claim.

The Court will exercise supplemental jurisdiction and address this issue in the interest of judicial efficiency.

As to Plaintiff's claim pursuant to New York Civil Service Law § 75-b, the Court finds that Plaintiff's claim should be dismissed with prejudice.  That law "provides . . . that a public employee cannot be subject to adverse action for having disclosed to a 'governmental body' information which either concerns a violation of a regulation that presents a substantial and specific danger to public health, or which he or she 'reasonably believes constitutes an improper governmental action.'" Yan Ping Xu v. New York City Dept. of Health, 77 A.D.3d 40, 46 (1st Dept. 2010) (quoting NY Civil Service Law § 75-b[2](a)).  To state a claim under this statute, a plaintiff must allege: "(1) an adverse personnel action; (2) disclosure of information to a governmental body (a) regarding a violation of a law, rule, or regulation that endangers public health or safety, or (b) which she reasonably believes to be true and which she reasonably believes constitutes an improper governmental action; and (3) a causal connection between the disclosure and the adverse

23

personnel action." Burns v. Cook, 458 F.Supp.2d 29, 44 (N.D.N.Y 2006).  The statute provides that employees subject to binding arbitration or collectively bargained agreements can use their protected whistleblower conduct as a defense in a disciplinary proceeding before arbitrators.  N.Y. Civ. S. L § 75-b(3)(a)-(b).  An employee not covered by such agreements "may commence an action in a court of competent jurisdiction[.]" N.Y. Civ. S. L. § 75-b(3)(c).  "A claim brought under Civil Service Law § 75-b must be brought within one year after it accrues."  Donas v. City of New York, 62 A.D.3d 504, 504 (1st Dept. 2009).

Assuming that Plaintiff could even bring a claim under Section 70-b(3)(c), that claim would be time-barred.  Plaintiff filed her initial Complaint on April 16, 2020.  See dkt. # 1. She has complained of an adverse employment action that occurred in November 2018. She brought her action more than a year after that date.  Even if the Court were to accept Plaintiff's argument that the adverse action in question did not accrue until after the arbitrator made her decision, Plaintiff admits that the decision came in March, 2019, more than a year before she filed her initial Complaint.  Plaintiff could not prevail on this claim, and the Court will grant the motion with prejudice in this respect.

Any defamation claims Plaintiff raises are likewise time-barred.  New York law provides that "an action to recover damages for . . . libel [or] slander . . . must be brought within one year."  N.Y. CPLR § 215(3).  New York law provides that a "cause of action for defamation accrues on the date the offending material is first published."  Nussenzweig v .diCorcia, 9 N.Y. 3d 184, 188 (N.Y. 2007).  As laid out above, even assuming that Plaintiff has alleged any defamatory conduct, such defamation occurred more than a year before she filed her Complaint.  The Court will grant the motion with prejudice in this respect.

24

**I.     Sealing of Documents**

Defendants also request that the Court lift the seal on documents the Plaintiff has

filed in this case.  Plaintiff moved on April 16, 2020, for an order to file the case under seal,

arguing that a public filing of the case would "[pose] a risk to her employment, as the

Defendants are current Employers and can act adversely . . . [a]s soon as Defendants will

decide to let it go public or redacted, Plaintiff would be very much willing to let it be."  Dkt. #

2.  Magistrate Judge Christian F. Hummel granted this motion by text order on May 5,

2020.  See dkt. # 6.  Judge Hummel granted the motion "temporarily . . . pending

appearances by defendants and an opportunity for defendants to respond."  Id.

Defendants have now responded, and opposed restricting access to the case.  Plaintiff has

not responded to this portion of the motion.

"The notion that the public should have access to the proceedings and documents

of courts is integral to our system of government."  United States v. Erie County, 763 F.3d

235, 238-239 (2d Cir. 2014).  Our system of government, founded on the rights and input

of the people, requires "that the people themselves have the ability to learn of, monitor, and

respond to the actions of their representatives and their representative institutions."  Id. at

239.  The idea is an old one, "[i]ndeed, the common law right of public access to judicial

documents is said to predate even the Constitution itself."  Id.

There is a common-law right to access court information, but there is also a

constitutional one.  "[O]ur Constitution, and specifically the First Amendment to the

Constitution, also protects the public's right to have access to judicial documents."  Id. at

239.  That right is "stronger than its common law ancestor and counterpart."  Id.  Two tests

exist to determine whether the First Amendment right to access applies.  Under the first

25

approach, the First Amendment right attaches when "'experience and logic' support making the document available to the public." Id. (quoting Logusch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006)).  The court is to "consider (a) whether the documents 'have historically been open to the press and general public' (experience) and (b) whether 'public access plays a significant positive role in the functioning of the particular process in question.' (logic)." Id. (quoting Logusch, 435 F.3d at 120).  If the First Amendment applies, "documents 'may be sealed [only] if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" Id.  The court's findings cannot be "'broad and general.'" Id.

Courts have been clear that "[t]he common law right of public access to judicial documents is firmly rooted in our nation's history." Logusch v. Pyramid Co., 435 F.3d 110, 119 (2d Cir. 2006).  This right exists because:

> The presumption of access is based on the need for federal courts, although independent–indeed, particularly because they are independent–to have a measure of accountability and for the public to have confidence in the administration of justice.  Federal courts exercise powers under Article III that impact upon virtually all citizens, but judges, once nominated and confirmed, serve for life unless impeached through a process that is politically and practically inconvenient to invoke.  Although courts have a number of internal checks, such an appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control.  Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior.  Without monitoring, moreover, the public would have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.  Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

Id. (quoting United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)).

The common-law right attaches when a court finds "that the documents at issue are indeed 'judicial documents.'" Id.  Not all papers filed with the court qualify; "[i]n order to be designated a judicial document, 'the item filed must be relevant to the performance of the

26

judicial function and useful in the judicial process.'" If such documents are judicial

documents, "a common law presumption of access attaches[.]" Id.  The court still must,

however, "determine the weight of the presumption."  In doing so, a court is "governed by

the role of the material at issue in the exercise of Article III judicial power and the resultant

value of such information to those monitoring the federal courts.  Generally, the information

will fall somewhere on the continuum from matters that directly affect an adjudication to

matters that come within a court's purview solely to insure their irrelevance.'"  Id. (quoting

Amodeo, 71 F.3d at 1049).  The final step for the court is to "'balance competing

considerations'" against access.  Id. (quoting Amodeo, 71 F.3d at 1050).  "Such

countervailing factors include but are not limited to 'the danger of impairing law

enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'"

Id. (quoting Amodeo, 71 F.3d at 1050).

Weighing these considerations, the Court concludes that restrictions on access to

the documents filed with the Court should be lifted.  The Plaintiff's stated reason for

seeking restrictions, that her employer could act against her if aware of her suit, is not a

compelling reason to restrict public access.  The public will not make a decision as to

whether to hire or fire Plaintiff, and her employer must necessarily know of the lawsuit.

The public's right to know of the lawsuit and the basis for the Court's decisions certainly

outweighs the Plaintiff's stated reasons for restricting access to the documents.   Judge

Hummel's order will be vacated.  The Clerk of Court will be directed to remove the

restrictions on documents filed with the Court, except for documents for which the Local

Rules of Court require restrictions.

**IV.    CONCLUSION**

For the reasons stated above, the Defendant's motion to dismiss, dkt. # 22, is hereby GRANTED.   The motion is granted without prejudice to Plaintiff filing Title VII claims against her actual employer and to any First Amendment claims raised with respect to Defendants Stout and Scherer, who were not served.  The motion is granted with prejudice with respect to Plaintiff's other claims.  The motion is granted as to Defendants Stout, Scherer, Congdon, and Balleau for failure to serve.  Plaintiff shall file a Second Amended Complaint restricted to any Title VII claims she may have against the Department of Public Service and any First Amendment claims she may have against Stout and Scherer within thirty (30) days of the date of the order.  Failure to file a Second Amended Complaint by that date will cause the Court to dismiss the case with prejudice. Judge Hummel's text order, dkt. # 6, temporarily granting Plaintiff's motion to restrict case documents, dkt. # 6, is hereby VACATED.  The Clerk of Court is hereby directed to lift the seal on docket entries in this case, excepted where required by the Rules of Court.

**IT IS SO ORDERED**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: August 11, 2021

28