**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**Olena Militinska-Lake**, an individual and a Senior Auditor of
**Department of Public Service, New York State**
175 S. Swan St., apt 9D, Albany, NY, 12210, t. 518 – 250-7550

|  |  |
|---|---|
| **Plaintiff**<br>vs.<br>**Defendants:**<br><br>State of New York;<br>Department of Public Service (DPS), State of New York;<br>Elatisha Kirnon in her individual and official capacity of Chief<br>Diversity Officer for Governor Office of Employees Relations, NY;<br>Doris Stout in her individual and former official capacity of<br>Director of OAAF, DPS, State of New York;<br>John Scherer in his individual and former official capacity of<br>Deputy Director of OAAF, DPS, State of New York;<br>Timothy Canty in his official capacity of<br>Deputy Director of OAAF, DPS, State of New York;<br>Christine F. Balleau in her individual and official capacity of<br>Director of Human Recourses, DPS, State of New York;<br>Thomas Congdon in his individual and official capacity of<br>Deputy Chair and Executive Deputy of DPS, State of New York; | Civil Case No.: <u>1:20 - cv - 443</u><br>(TJM / CFH)<br>**SECOND AMENDED**<br>**COMPLAINT**<br><br>**CIVIL RIGHTS**<br>**PURSUANT TO**<br>**42 U.S.C. § 1983**<br><br>**TITLE VII OF THE**<br>**CIVIL RIGHTS ACT,**<br>**AS AMENDED**<br><br>**PENDENT JURISDICTION**<br>**28 U.S.C. §1367**<br><br>**DEFAMATION** |

Plaintiff demands a trial by: ___✔___ JURY _____ COURT (Select **only** one).

1.      Plaintiff in accordance with DECISION & ORDER, dated 08/11/2021 and entered the Court 08/12/2021 respectfully submits her Second Amended Complaint. Plaintiff also respectfully informs the Court of her intend to use her right to attempt appealing some of the decisions in the Order for the following reasons:
   a.   Plaintiff is a pro se filer without any experience of any prior court, and
   b.   Plaintiff filed her initial Complaints in the difficult conditions of Pandemic, without possibility to find the lawyer (and still have no lawyer, as they do not take the cases on the middle of process); therefore
   c.   Plaintiff missed some facts, as she did it by memory due to COVID, and inaccurately described some of them as well as her thoughts and feelings about them in accordance with requirement of legal claims, and
   d.   Plaintiff discovered a mistake in the date of Arbitration Decision (accurately stated in her Opposition to Defendants), which was May 16, 2019, rather than March 2019, as it was erroneously picked up into DECISION & ORDER (from some other multiple dates in March). As this date affects the statutory limitations, it may affect some of the decisions in the DECISION & ORDER.
2.      Therefore, Plaintiff appreciates the possibilities of Second Complaint and respectfully modifies her claims to more properly explain the facts and her thoughts and feelings about them in accordance with requirements of legal claims, and includes the subjects, affected by discovered mistake for the second thoughts in appeal.

## JURISDICTION

1. This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution of the United States. Jurisdiction is conferred on this court pursuant to 42 U.S.C. § 2000e-5(f)(1).

2. Venue is invoked pursuant to 28 U.S.C. § 1391.

3. This action is also brought pursuant to:
   - Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. § 2000e *et seq.;*
   - Civil Rights Act of 1991, employment discrimination based on race, or national origin;
   - 42 U.S.C. § 1983, with jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), and 2201;
   - New York Consolidated Laws: Executive Law - EXC §296, Civil Service Law - CVS §75-b, with consideration of New York Civil Rights Law §74, Civil Practice Law and Rules - CVP Rule 301, with supplemental jurisdiction conferred on this court pursuant to 28 U.S.C. §1367.

## PARTIES

4. Plaintiff:     Olena Militinska-Lake
   Address:      175 S. Swan St., apt 9D, Albany, NY, 12210, t. 518 – 250-7550

5. Defendants, at all times relevant to this case, in their official capacities were acting in the course and scope of their authority, under color of United States Constitution and Law, New York State Law, statute, ordinance, regulation, custom or usage of New York State subjects or causes.

   a.  Defendant:            New York State (Defendant-State)
       Address:              Attorney General's Office

   b.  Defendant:            Department of Public Service (DPS), (Defendant-DPS)
       Official Position:    State of New York Government Agency
       Address:              3 Empire State Plaza, 20th Floor, Albany, NY, 12223

   c.  Defendant:            Elatisha Kirnon (Defendant-Kirnon), Chief Diversity Officer for
       Official Position:    Governor Office of Employees Relations, (GOER) State of NY
       Address:              2 Empire State Plaza, Albany, NY, 12223

   d.  Defendant:            Doris Stout (Defendant- Stout),
       Official Position:    Former Director, Office of Accounting Audits and Finance (OAAF)
       Address:              3 Empire State Plaza, 6th Floor, Albany, NY, 12223

   e.  Defendant:            John Scherer (Defendant- Scherer),
       Official Position:    Former Deputy Director of OAAF, DPS
       Address:              3 Empire State Plaza, 6th Floor, Albany, NY, 12223

   f.  Defendant:            Timothy Canty (Defendant- Canty),
       Official Position:    Deputy Director of OAAF, DPS
       Address:              3 Empire State Plaza, 6th Floor, Albany, NY, 12223

   g.  Defendant:            Christine F. Balleau (Defendant- Balleau),
       Official Position:    Director of Human Recourses (HR), DPS
       Address:              3 Empire State Plaza, 16th Floor, Albany, NY, 12223

   h.  Defendant:            Thomas Congdon (Defendant- Congdon),
       Official Position:    Deputy Chair and Executive Deputy of Public Service Commission
       Address:              3 Empire State Plaza, 20th Floor, Albany, NY, 12223

6.      Defendant's conduct is discriminatory with respect to the following (check all that apply):
        (A)_____✔_____My race or color.
        (B)_____My religion.
        (C)_____My sex (or sexual harassment).
        (D)_____✔_____My national origin.
        (E)_____My pregnancy.
        (F)_____Other: _____.
7.      The conduct complained of in this action involves:

        (A)_____Failure to employ.
        (B)_____Termination of employment.
        (C)_____✔_____Failure to promote.
        (D)_____✔_____Unequal terms and conditions of employment.
        (E)_____Reduction in wages.
        (F)_____✔_____Retaliation.
        (G)_____✔_____Other acts as specified below:
                        Suspension without pay, harassment based on national origin and race

## INTRODUCTION

8.  Plaintiff, Olena Militinska-Lake (Ms. Lake, Olena Lake, Olena), is an American citizen, naturalized in 2007, of Ukrainian origin. Plaintiff is fluent in English; however, English is not her native language. Plaintiff's native languages are Ukrainian and Russian.

9.  Plaintiff was graduated from SUNY, Albany, in 2007 with Master of Science degree in Accounting, in 2008 with Master of Science degree in Taxation. Before that, she was graduated with Master of Science degree in Economics/Political Economy, Kiev State University, Ukraine. She also attended SUNY Ph.D. program in Information Science in 2007 – 2008 till ABD level.

10. Plaintiff was appointed to a position of Senior Auditor, salary Grade 18, at DPS, Defendant, on April 23, 2009.

11. During her 10 years of State Service, Plaintiff was given only satisfactory Assessments, was named as one of best auditors, valuable contributor in OAAF Director's Memorandums (Memo) and in Assessments of Supervisor and praised at Annual Seminars for projects' achievements.

12. On November 8, 2018, Plaintiff was awarded the 10-year dedicated service Certificate on DPS Award Ceremony conducted by Defendant-Congdon.

13. On November 9, 2018, around 5 pm, unexpectedly, Plaintiff was handed the Notice of Suspension (Notice) by Defendant-Congdon, accompanied by Defendant-Balleau, and Associate Director of Human Resources, Mr. Roger Halbfinger. The Notice informed: "effective immediately, you are suspended without pay due to acts of discriminatory conduct and the use of racially discriminatory terms."

**FACTS**

14. On March 18, 2014, Mr. Shang Hongbing (Jerry), Plaintiff's co-worker of higher Grade 23 with Supervisory responsibilities, her prior and future cube neighbor, committed a brutal harassing attack on Plaintiff based on her national origin. That day, after annexation of Ukrainian Crimea by Russian Federation (RF) on March 16, 2014, Mr. Shang met Plaintiff (with water jar in her one hand and a cup in another) in narrow corridor, blocked her exit, and started making T-signs (timeout) in front of Plaintiff's face, almost hitting it, if not turned. Mr. Shang proclaimed: "Time out! No discussion! You are Ukrainian, you must not like what Putin did to Ukraine, don't you? Time out! No discussion! I like it, because China supports Putin!" Out of shock, Plaintiff, silently, was barely able to escape him.

15. Plaintiff reported to OAAF Director this attack as well as Mr. John Huang's (resigned) jokes in the same matter. Director, Ms. Stout, and HR did not take this matter seriously, as it is required by due process in Employees Handbook, they just informally spoke with Mr. Shang, and Mr. Huang. Even though, Mr. Shang made another attempt of his harassment. Plaintiff was deeply insulted personally by Mr. Shang's aggressive gestures and even more insulted on behalf of all Ukrainians, whose wound is very deep with that annexation and the following war. Plaintiff was not less insulted as a naturalized American, whose citizenship is also subjected to the Oath to America, its interests and constitution, not to China, and Plaintiff follows it diligently.

16. The actions of RF in Ukraine were and are a touching subject for Plaintiff - her entire family lived at that time there and her youngsters, Doctors, were under potential total mobilization. Harassing attacks from Mr. Shang in that matter and adverse positions and actions of Management towards Plaintiff resulted in stress lead to Plaintiff's stress-related life-threatening health condition, which she assumed early June and diagnosed in September 2014[1].

17. That harassment from Mr. Shang was soon completely turned against Plaintiff by OAAF Director in Ms. Stout's core Memo dated 10/15/2015,  reflecting it as Plaintiff's "particularly hateful note apparently addressed at his Chinese roots … considered a form of harassment based on his ethnicity … prohibited behavior … indication of harassment" when Plaintiff reminded to Director about the value of Naturalization Oath, as a prerequisite for citizenship, and a citizenship as a requirement for Government employment.

---

[1] Plaintiff was operated on 09/11/2014 and following treatment during the next 9 months. Because Plaintiff is not in any risk groups (alcohol, tobacco, drugs, obesity, etc), the only cause of this health condition the doctors give is stress.

18. Instead of properly relate to Plaintiff's whistleblower efforts, legislatively protected, and open the investigation of Mr. Shang's harassment of Plaintiff as it is required by due process, equal protection, and anti-Discrimination law, incorporated into NY State's Employees Handbook, Director reprimanded Plaintiff at counselling session with HR, discussing her core Memo, and placed it into Plaintiff's Profile, retaliating and inhibiting Plaintiff's any further promotions and depriving Plaintiff of the dignity of her respectful existence in OAAF and advancement of her career.

19. Those actions of OAAF Director and HR constitute a retaliation on Plaintiff in violation of her civil rights, protected by Title VII of Civil Rights Act, 42 U.S.C. § 1983, and respective NY Executive Law § 296, Civil Service Law - CVS § 75-b, and whistleblower protection. They violate the equal protection and due process, depriving Plaintiff of her invaluable life-time property of dignity and respect at her employment (with corresponding advancements in career), protected by Fourteenth Amendment to Constitution, as well as Plaintiff's constitutional rights of free speech in protection of public interests (correctness of Government appointees composition) established in regulations, use and custom, patronaged by Plaintiff's thoughts and feelings not controlled by working time for Employer, influenced Plaintiff's actions, protected by First Amendment.

20. In such depriving and retaliating capacity, this core Memo from October 29, 2015, and further discriminative developments and actions against Plaintiff exist till today, 09/10/2021. After that event, the deterioration of Plaintiff's career and deprivation of dignity in the Office began and her position on the Organizational Chart was frozen at the bottom.

21. Plaintiff was rotated out of prestigious major Utility sector to much smaller sector early 2015 after her selfless work and significant findings in major Utility's Sandy Storm audit late 2014 were unexpectedly and abusively rejected by OAAF Deputy Director, Mr. Scherer, at the time when Plaintiff fought for her life with threatening health condition, being considered disabled.

22. During her disability (second half of 2014 - first half of 2015 and the next 3 years afterwards, per ADA[2]) Plaintiff still successfully worked on fruitful projects in 2015 – 2017, internal models' corrections, their improvement proposals, when MT and HR were developing the destructive and defaming retaliating activity against Plaintiff, complicating Plaintiff's fight for life against life-threatening health condition. Multiple Memo, emails, and notes[3], originated, encouraged, or

---

[2] ADA – Americans with Disabilities Act of 1990
[3] Will be presented at Discovery

suggested by OAAF and HR management, contradictive and controversial (from Lilly Carroll for "not making eye contact", from Debbie Evans for "staring at", etc.), flooded the Plaintiff's profile leading to multiple counselling of Plaintiff and two Interrogations (January 25-27 and April 27, 2017). Directors of HR and OAAF, and Deputy Director of OAAF, fabricated disparaging "evidence" and subjected Plaintiff to disgraceful psychological evaluation at Employees Health Service (EHS) with projected unpaid 1-year Leave of absence then potential further termination, which failed upon successful evaluation. That mentally harassing activity continued until Plaintiff, using Employees Handbook and Training materials on discrimination and harassment, proved to HR (04/27/2017) that those actions constitute the discrimination and harassment, and requested HR to open the investigation following the rules of Handbook.

23. Besides that, Authorities of Defendant-DPS, (not exactly known due to confidentiality of management decisions) from OAAF and HR were attempted to deprived Plaintiff from the normal process of Interrogation, not letting her know about her right to have a representative of Public Employees Federation (PEF) on her side. That is why the first interrogation, January 25, 2017 was split on 2 parts (on 25 and 27, making total number of interrogations to 3), as Plaintiff discovered that she has that right and postponed the interrogation. The EHS evaluation was scheduled without providing any information to Plaintiff about what was claimed against her, which she discovered from the doctor, at the beginning of evaluation on 01/19/2016[4]. After EHS doctor informed her about her right-to-know, she request all the copy of package, sent to the doctor, they postponed evaluation until later.

24. The 2017 investigation by Mr. Eng, Affirmative Officer selected by HR, was not in favor of Plaintiff, as Mr. Eng limited his investigation only to the latest 2016 promotion and was looking for harassment's signs in discrimination matters - elementarily doomed to failure. Defendant-State failed to provide the proper competence of investigator and process, as Mr. Eng during the only one phone interview was assuring that Harassment is the same as Discrimination and subordinate can discriminate his manager, which is nonsense according with law, as subordinate may harass his manager with inappropriate jokes, but cannot discriminate as he has no employment related decisive power over his manager. So, harassment is explicit, when discrimination may be implicit and require not only look at explicit comments but analyze the facts and circumstances why non-superior employee get promoted and superior is not. Also, nothing was given to Plaintiff about analysis during the investigation – only 3-lines final report.

---

[4] The email document about this will be presented on Discovery

25. Mr. Eng ignored the facts, reported by Plaintiff, of some promotions of co-workers without any superiority in education, experience, or work achievements, subject to question and open investigation upon not promoted employee's complaint (as suggested by training materials). Per Plaintiff's information and belief, some promotions are done on friendship basis. Mr. Shang has the common hobbies with Deputy Director, Mr. Scherer: gardening and fishing with probability of being neighbors in some proximity (suggested by Mr. Shang's phrases to Mr. Scherer: "Should you catch more fish than you need, swing by my house – I will take some", etc). In the same time, Plaintiff witnessed the poor quality of his work: his missing the fundamental difference between Sales taxation of Maintenance and exemption of Capital Improvement; his inability to assess the combined tax formula; his terminological mix and mess in one of his Orders, suggested to Plaintiff for benchmarking); and later, his enormously frequent phone calls and long discussions with Utility under his audited in a language different from English, when those conversations are very restrictive and limited only for requesting the information or clarification upon exhaustive individual and team work with entire Office resources to get clarification internally. The other example, Plaintiff reported to Mr. Eng, is a promotion by Ms. Wang her lunch-friend Ms. Sun Dongning. They are overtly having lunches together for many years. In the same time Plaintiff, by heritage of projects, evidenced poor quality of Ms. Sun's work in small Water Case and Cable audit. And it is reasonable to assume, that no one in OAAF has better than Plaintiff's education (3 MS degrees) and major skills (programming level of Excel proficiency – main auditor's tool and admitted by Supervisors analytical and mathematical skills, etc.). Even though, the aggressive mental harassment of Plaintiff shortly stopped.

26. Starting late 2014 through 2017 Plaintiff was cautiously informing Management Team (MT) about misleading Rate Cases' Model calculation for required conclusion and was proposing to use her math-proven, automated, multi-year, visualized Model with charts, precisely serving for that conclusion, as an addition to the Model in use. Mr. Scherer in his email 07/18/2017 unreasonably abusively rejected Plaintiff's proposal and forbade any talks about her proposed and already used Model in analogous, Earnings Compliance, calculations. In addition, late 2015, Plaintiff was moved out of Rate Cases, mainstream knowledge and promotions, to non-regulated low priority sector, questions about which never appear on promotional exams, thus even more limiting Plaintiff's promotion. As a result, Plaintiff was rejected 2015, 2016, 2017 and 2018 promotions.

27. Promotions of 2015 and 2016 were among minimal participants, 2 or 3 besides Plaintiff. There was no information about why the person was not promoted to improve the staff for next promotion.

28. In 2017, when there were more and younger participants, this, the "Exit interview" with those explanations was conducted. Plaintiff got dishonorable comments about her problems: bad writing (she missed couple of gramma-articles "here and there" in her essay about her work achievements, required for participation), not following the materiality concept (which is questionable depending how to approach it – on aggregate basis or by each small item). The materiality concept, constantly incriminated to Plaintiff, was one of bullying ways to implicitly diminish her work results. If she was given to work with items of small amounts, she is not able to get big adjusting amount, and, if taken by items and not aggregately, then no adjustments, the work is not good. If Plaintiff will try to make those adjustments, which aggregately are solid, then she may not follow the materiality. Evil circle used for badgering her. The most concerning comment was that Plaintiff is not "pleasing her supervisor". However, nobody even mentioned any of model and methodology corrections and improvements, Plaintiff described and proposed in her essay again, nor any of her successful projects, some of which were prized on Annual seminar by Defendant-Stout (Smart Grid). No one word, not good, not bad, just a disregard. Plaintiff felt very badly diminished after that. So, even proper due process was used to put her down and deprive her dignity and motivation. The discrimination complaint after that were ignored again, instead of opening investigation per due process in Employees Handbook. So, Defendant-DPS was not able to provide the due process, not depriving the Plaintiff's dignity, decency and respect.

29. In 2018 promotion looked like targeted. There were 2 potential and then actual promotees and the questions on internal interview-exam were mostly from their sector. Some of which were tricky, obviously related to particular circumstance, known by them, but not by everyone else. Defendant-Canty praised multiple times the young lady-promotee for her "pleasing him with her work". Therefore, her promotion was anticipated with no question. Why Defendant-State created the exam and all other tinsel of visual due process? To evolve the managers creativity to overcome it and deprive others, like Plaintiff, from dignity and proper evaluation for advancing?

30. The young gentleman-promotee was visibly pleasing as well, beforehand helpful to supervisors, not even being asked. But in 2015 he was granted the provisional promotion, which he was not able to hold as he did not pass the State exam. But before that, right upon that provisional promotion, he dropped to her the multiple mistakes and unresolved problems of his part of mutual Project with Plaintiff and quitted followed by his manager excuses for him. One of which, was related to DPS budgeting charges, discovered by Plaintiff, after his departure from the project. Plaintiff presummed they are important and need to be done correctly, being a political issue. She

did not know at that time, that the silent target of any project is "just wrap it up!", as Defendant-Stout was pushing it on Plaintiff later, rather than "do it right". Plaintiff reported those problems inherited after gentleman, which immediately complicated her work, to her supervisors and they stuck in multiple re-considerations. After she was asked why the project is not moving fast, she disclosed those mistakes and problems left unresolved by that gentlemen, but he still was pushed for promotion.

31. After refusal of promotion this time and upon invitation to Exit interview, preventing to have another disrespectful one as it was in 2017, Plaintiff on 10/23/2018 emailed her request to interviewers to invite HR and DEEO (Defendant-Kirnon's office) and to re-schedule her appointment for later due to that. Defendant-Stout (it was forwarded to her) emailed Plaintiff's request to HR with her suggestion that it does not need to be satisfied, informing Defendant-Balleau: "As expected she Is claiming discrimination despite our thorough review process" and refused to do anything, including the Exit interview. No response was given to Plaintiff. But at that time, she was overwhelmed with her sexual and national origin harassment from Mr. Shang, more than this interview. Therefore, Plaintiff was disrespectfully deprived her right of due process, equal protection, comparing to other participants, who did get that information about obstacles of their promotions.

32. Soon, Plaintiff was contacted by Defendant-Kirnon, who refused to help her in that matter. So, Defendant-State is not helpful to secure the constitutional rights of Plaintiff, even having a specific Office for that.

33. Mr. Shang, contrariwise, was under MT's favor for promotion. He was granted the management approval to present the Plaintiff's Model of Earnings Analysis (forever rejected to her by Deputy Director, Defendant-Scherer) 12/21/2017 during Staff's internal training on Earnings Compliance – a significant point in continuous progression of Mr. Shang's career. On 05/21/2018, at Annual Assessment, Plaintiff used her self-assessment option to inform MT, and DPS Chair about mismanagement, inappropriate promotions, discriminative misappropriation of work results. All that is detrimental to DPS personnel, and eventually negatively reflected on utilities and ratepayers wasting their money on DPS's longer time for analysis and conclusions. All Plaintiff's innovative proposals, models and methods' improvements or modifications are intended for public interest to time and quality of DPS work. Plaintiff's Earnings Analysis Model is well-developed and refined with charts, easing analysis, giving instantaneous results, and facilitating the fast and proper conclusions. When Mr. Shang's one was a draft-type calculation, presented by

him on seminar. MT condemned Plaintiff's report in her 2019 Annual Assessment in negative "Scription", retaliating and violating her whistle blower protection and First Amendment rights.

34. Early 2018 Plaintiff discovered and reported in her new sector the significant flaw in the audit methodology, used for 7 prior years by prior Account Executive of that sector successfully promoted from it. This flaw inhibits any meaningful audit findings. It was explicitly manifested in re-opened at that time audit, which gained a special DPS attention in 2018 after independent auditor, hired by municipality since not having the results from DPS, revealed a substantial deficiency, not identified by any of three prior OAAF auditors of much higher Grade, who were working on this audit sequentially during 6 prior years, using prior methodology[5].

35. In response to that discovery, Director OAAF gave Plaintiff extremely unrealistic time, 2-3 weeks, not substantiated by any necessity, to complete this recently re-opened Audit, which no one of three prior Auditors were able to complete during 6 prior years, even without findings. Early November 2018, close to completion of the Audit, Plaintiff informed that she will come close to results of Independent Auditor of significant deficiency of Cable Company's payments to Municipality, using her new methodology. Three days before its completion, Plaintiff was suddenly suspended from work with attempted termination without any attempts from management to secure and transfer of Plaintiff's work to somebody else. This fact of willful mismanagement in OAAF, inside of DPS, reveals the discriminative unreasonable work time assignment, as not results were important, the harassment of time-pressure for Plaintiff was. This discrimination and retaliation violate the Plaintiff's civil rights, protected by Title VII of Civil Rights Act, as Amended, protected by First, and Fourteenth Amendments. It also violates New York Consolidated Laws, Executive Law - EXC §296, Civil Service Law - CVS §75-b.

36. Mr. Shang, meanwhile, became Plaintiff's cube neighbor again beginning of January 2017, after some internal relocations. At that time Mr. Shang was preparing for his next career step to Grade 27 with some managerial position on the Organizational Chart. Mr. Shang was given more Supervisory responsibilities, overseeing more subject matters and being, yet unofficial, Account Executive Auditor of one of the major Utilities.

37. Plaintiff, surprisingly, noticed that Mr. Shang during phone conversations with overseen Utility was switching to the other language, most likely native language (his language). After naming the Utility Executive on the phone he became pronouncedly friendly in his language. Mr. Shang was

---

[5] Due to confidentiality considerations, Plaintiff will name all individuals and entities, described in this section, and disclose specifics in this matter, if needed, during the discovery stage of this case.

naming the people in the office, then, talking in his language, was laughing and giggling. Or he was using English professional terminology and again his own language.

38. Plaintiff knows that conversations with Utility are very restrictive, they are part of Policy of Confidentiality, as DPS internal work is confidential, only the final results are made public[6].

39. In the beginning of July, Plaintiff expressed to Defendant-Canty, in his office, her concern of those Mr. Shang's conversations. Defendant-Canty suggested to resolve this issue through HR and called on speaker to HR Director at that time, Janice Nissen, and asked what the language policy in DPS is. Ms. Nissen said that there is no English-only policy in the Department, from which Defendant-Canty concluded that Mr. Shang can talk any language he wants, any time he wants, with anybody he wants. Any restrictions would be discriminative concluded Defendant-Canty. Later, he confirmed this conversation to directors and some top managers in his email, which was used in Arbitration.

40. On January 22, 2018, the team lead at that time of Consolidated Edison (ConEd) auditors, Ms. Manz, hold the meeting with her group, including Mr. Shang, about starting the new Case. Right after that meeting Mr. Shang rushed into his cube (Plaintiff's cube at that time was facing the door of conference room) and called Mr. Wenqi Wang (naming him Winchi), the Regulatory Executive in ConEd at that time. Surprisingly, Mr. Shang (Grade 23 at that time) started talking about the new Case team what normally do the team-leads, if they do. He was naming the people in the team, their titles, responsibilities, probably discussing the career of Ms. Manz, mentioning KPMG training soon after her name, and the rest on his other language loudly giggling and laughing. It was very unpleasant to hear such talking about Plaintiff's colleagues, not knowing what the giggle was about.

41. Plaintiff felt her responsibility to reported that tactless conversation, to put it mildly. She described this to Ms. Manz, who listened to her carefully, thought for couple of seconds, and said that possibly he is describing the responsibilities of a team members, which she was thinking to

---

[6] The conversations with utilities, the auditees, besides restrictions imposed by Policy of Confidentiality, are regimented by internal practice, assembled from that and other regulations. This practice establishes the minimum thoughtful conversations with utilities, mostly of group of people, at least including the supervisor (or some others on the team, so there will not be multiple phone calls of each one, rather the common discussion of problems, discussed before internally). The calls mostly purposed to get the information or remind about anticipated information, if utility is not providing it in time, or providing not what was requested, or to get some clarification of already provided information, etc. These calls supposed to be thoughtful, discussed with supervisor before and approved by him and only after internal reserves of information are exhausted (to make sure that somebody else in the OAAF did not call for the same matter, or have the expertise and may answer or shed the light on subject, etc). The outside the matter discussions are not supported, and questions from the utility, related to something outside of responsibilities of the group need to be transferred to special person of Public Relations.

do briefly later. But it is OK with her that he did it first. However, she will talk to Mr. Canty, Defendant-Canty whether that matters. Plaintiff decided not to create the broken phone and speak to Defendant-Canty herself to describe the unpleasant situation, considering his continuous suggestion to everyone: "Stop by any time – my door is always open! It is better to talk off the problem right away, rather than going into emailing and reporting".

42. The conversation with Defendant-Canty did not go that open and confidential way, as Plaintiff planned. From the first words, he suggested that he will invite Mr. Shang to this conversation and Plaintiff will say what she wants to say. It was a huge mismanagement decision. The managers' rule to resolve conflict or problem is always: "Do it yourself. Never involve any other subordinates into the problem, nor let anybody do it for you".

43. Plaintiff was not able to describe all the unpleasant feelings of Mr. Shang's phone conversation. She was trying to make a polite notion in general about the conversation in another language to avoid the confrontation. But confrontation could not be avoided. Mr. Shang said: "I will tape her conversations in Russian" (he repeated that to Defendant- Stout later time, and she documented that and presented to arbitration 03/25/2019 as her "defense"), which was a discriminative and harassing statement. Plaintiff has no one to discuss business in her native language, so that statement of Mr. Shang was related to Plaintiff's incidental personal conversations on the phone with her mother, or Russian-speaking doctors, or so. Defendant-Canty did not stop Mr. Shang, nor made any warning to him. He let him express all his displease towards Plaintiff and leave the room. After that Defendant-Canty turned towards Plaintiff and reminded her about his tolerance and support to Mr. Shang's business conversations in "any" foreign language. Defendant's-Canty absence of elementary knowledge of Anti-discrimination law, his mismanagement, and his discriminative approach towards Plaintiff was obvious. He was very caring to defend Mr. Shang's native language in business talks, letting him continue to violate the law and all regulations, but did not impede Mr. Shang's attack of hatred against Plaintiff's native language in her private conversations, forgetting about his own assertion "there is no English only policy in DPS".

44. Plaintiff, on the other hand, read the Law, made a research and analysis, she understood that there is a huge misunderstanding in the Department (apparently, among all managers, including lawyers, and not only of this Department). There is gross misread, misunderstanding and mixture between the Language Policy and English only Policy everywhere, generally. And in sake of not being considered discriminative, the managers swing into the complete language freedom, as new Director, Christine Balleau stated later in one of her welcoming email (on 06/07/19) to Plaintiff upon her return back to work after her suspension: "Employees may use foreign language to

communicate in the workplace if it doesn't exclude other appropriate parties from the discussion. This is not limited to only an employee's native language. This is addressed in the Equal Employment Opportunity in New York State Handbook."[7].

45. However, there *is* a Language Policy in the Department. It consists of 2 words: "Fluency in English", a requirement for any appointee to certain positions in Department, including Auditor's.

46. The Law says that language restrictions are discriminative unless they are required to conduct the business. So, the requirement of English fluency is a requirement of DPS business, and there is a simple reason: it is language-intense business: Orders, Testimonies, Petitions, public hearings, etc, everything needs to be in the most common language of this country, which is still English so far. Auditors are not customer service of utilities; they are regulators and forensics investigators. In its state business, DPS, and their officers / associates are entrusted of public trust, which they cannot violate. If it would be a language amalgama, when everyone speaks any language, not understanding each other, there is no guarantee that public trust is not violated, that auditors are unbiased and not making their own interest related decisions, or holding their own business under the agency's cover, etc.

47. So, Language Policy is *not* the same as English only Policy.

48. If Language Policy, non-discriminative, restricts only business conduct to English, not incidental personal conversations, and "English only Policy" is discriminative as it restricts any

---

[7] In the same email, further, Defendant-Balleau, the Director of HR, said: "Any further questions related to the interpretation of the Handbook should be addressed with the Governor's Office of Employee Relations' Anti-Discrimination Investigations Division", thereby, with Defendant-Kirnon, as a chief of that Division. It appears, the implementation and understanding of regulation goes on a circle of the same people, who have no clue about what Law is and what the Handbook says. Thus, they are creating their own rules, contradicting and violating the Law Yes, the Handbook addresses the Language issue, but not the way, Defendant-Balleau interpreted, quite opposite:
- The Anti-discrimination law (Language section) protects only native language of individual, not any foreign language s/he wants to speak. So, this is personal rule created by Defendant-Balleau, contradicting and violating the Law.
- This law considers the requirements of business, not individual participants of particular discussion. If Plaintiff was isolated among a group of same-language speakers (her neighbors on the left and right sides of her cube), and they were discussing the business on their own language, when Plaintiff was isolated from mainstream case-work; and considering that the experience growth with knowledge transfer going mostly verbally, then, such isolation and business discussions in foreign language within the cubical system, designed for open exchange – this is destructive for business as it slows down the employees' experience and knowledge growth. The business discussions in open cubics' space in different language, besides distraction, are discriminative to others around, and as they are detrimental for business in general, they need to be eliminated as an obstacle to business in accord with Anti-Discrimination Law. Thus, this is again the personal rule created by Defendant-Balleau, contradicting and violating the Law.
- Plaintiff made that isolation known to Defendant-Kirnon on their meetings 09/26/18 and 10/17/18, but she chose to ignore the Law, thus violating it and discriminating the Plaintiff together with the group of OAAF discriminators.
The Arbitration did not explain the law to participants and did not target to settle its violation towards Plaintiff: discrimination, defamation, violation of her civil rights of 1st Amendment and Due Process. The Arbitration simply restored Plaintiff at work because of excessiveness of her suspension. Therefore, this court case is important to restore the fairness and prove that the Laws exists and works, what it says, and how it works.

conversation including private ones during the business, then it is a Venn Diagram: when Language Policy exists, it restricts only business conduct to English, but incidental personal conversations supposed not to be discriminated by "English only Policy", so they can be in any language. Very simple but appeared incomprehensible diagram.

49. Of cause the personal conversation are supposed to be incidental, minimal during the business day, and not lengthy as Mr. Shang's with business counterparty, giggling, or with professional terminology, and the rest who knows what, when both are fluent in English, as required by both businesses.

50. There is a combination of multiple policies and standards regulating the ethical conduct of state auditors: State Ethics (requiring not to violate the public trust), Auditing Standards (preventing auditors to get very friendly with auditees by requiring rotations), DPS Policy of Confidentiality (keeping internal business conduct confidential and only results and finally reached decisions are public, same as with any investigators, judges, lawyers, etc). So, Language Policy is an intermediary between all of them, as they all related to some language communication.

51. Disrespect to Law, regulations, absence of intent to know the Policies of own Agency, to learn, research, analyze its and other regulative requirements, combination and interrelation of all those – all that is a gross mismanagement and violation of Discrimination Law, specifically related to Language, as it requires its careful implication.

52. All the above, in addition to permissiveness of MT for Mr. Shang and extreme restrictiveness towards Plaintiff, evidence the gross mismanagement and discrimination resulted in violation of Plaintiff's civil rights, protected by Title VII of Civil Rights Act, as Amended and constitutional right of Fourteenth Amendment, as well as New York Consolidated Laws, Executive Law - EXC §296.

53. After Defendant-Canty disclosed the Plaintiff's complaint about Mr. Shang's language his displease significantly increased and those type of conversations became more loud, longer, and friendly. Plaintiff, on the other hand was not losing her hope to convey her concern about those conversations and her analysis of Law and other regulations to the management to prevent further inappropriateness of those. She raised that issue to Deputy Director, Defendant-Scherer.

54. Defendant-Scherer, during the discussion with Plaintiff on 03/31/18 in his office about Mr. Shang's foreign language issue, responded with citation: "require speaking English at all times in workplace maybe national origin discrimination", following the position of Defendant- Stout in that matter and insinuating that Plaintiff can be accused in discrimination. Then he abruptly disrespectfully ended conversation: "Do your work rather than looking around and complaining",

ignoring the Plaintiff's claim that those extensive conversations are the obstacles for her concentration on work (which is a human psychology - to be alert when something unknown is around). This way he discriminated against Plaintiff's national origin, ignoring her complaint about language isolation problem (within a group around her with the same of Mr. Shang's native languages, actively used in business discussions), if consider that her native language is not English and it requires for her more brainwork and concentration and it is very distracting when a third, unknown, language is actively used around.

55. In his next-day follow-up email 02/01/18 he confirmed his assertions and demonstrated his unawareness of language policy in DPS which requires from auditors "fluency in English" in their job description. That requirement can be legal and not violate the Anti-Discrimination law, Language section, only if supported by business necessity. So, the simple logical is: if English is required to be fluent for business necessity, then employee must fluently use it in the business conduction and not just to keep it in mind and use any other foreign language he wants – then – it is not a business necessity, and requirement is illegal. If it is illegal, then DPS must accept and appoint for auditors and other Staff members' positions the individuals with any level of English knowledge, or even without it. But this would be a disaster for DPS. Thus, language requirement goes hand-in-hand with proved necessity of its use, so requirement of its use for business. And this makes this simple, 2-words requirement to be a Language Policy with its requirements and obligations. This is 2 + 2 = 4, which nobody even tried to add together for 6 years, since 2017, to understand what Plaintiff is talking about. And this is because the Plaintiff is in her outcast status since 2014, when her discrimination began. She is considered to be stupid (despite having 3 MS degrees, including 2 from SUNY Albany and PH. D study till ABD level), her opinion does not matter, it is just annoying in general, and in work matters, particular. It was appeared explicit, when in her new Cable section, the prior Account Executive, Mr. Shahbazian, exclaimed with surprise: "You are smart!", during the discussion when he was transferring his work to her, proving that it is surprising to OAAF staff.

56. Then, Defendant-Scherer wrote in that email: "Additionally, I reached out to the utility that you referenced and discover that It too has no required language policy", describing his extra steps to excuse Mr. Shang for secret conversations on business calls in foreign language with auditee, violating all 4 regulations: Language policy (requiring to be fluent in English while conducting the DPS business), Ethics law (keeping public trust with no kinship), Policy of Confidentiality (strictly regulating the confidential work of Auditors and their conversations with utilities), and Auditing Standards (not to develop the friendship with auditee).

57. In that regard, Plaintiff recollected her late 2013 conversation with Slavic speaking therapist for her complicated wrist fracture therapy, which needed Insurance approval for every visit. Even though it was private conversation in her lunch time, the Deputy Director, Mr. Scherer, through her Supervisor, Mr. Higgins, forbade Plaintiff any non-English conversations in the Office, violating her Title VII of the Civil Rights Act, as Amended.

58. Caring about public interest and the negative effect on it of revealed unawareness of DPS top managers about its internal Policies, Anti-Discrimination Law requirements regarding the language, Ethics law, and, as a result, the overall permissiveness to secret friendly conversations between DPS Auditors and Executives of companies under the audit, Plaintiff researched, discovered, and formulated the violations. One is a prevention of friendly relationship between the Auditor and Auditee - the Auditing Standards requirement of periodic Auditors' rotation.

59. Another one is related to Ethics Law, which is lectured every year for DPS Staff and the Booklets clearly explain that: The NYS Public Service Law §§ 9 and 15, the State Ethics Law set forth in Public Officers Law §§ 73, 73-a, and 74, implemented into Department's policies, stipulates: "No employee should use or attempt to use his or her position to secure unwarranted privileges…"; "An employee should not give reasonable basis for the impression that any person can improperly influence him or her or can unduly enjoy his or her favor in the performance of official duties, or that he or she is affected by the kinship, rank, position or influence of any party or person."; "An employee should endeavor to pursue a course of conduct that will not raise suspicion among the public that he or she is likely to be engaged in acts that are in violation of his or her trust." [8]

---

[8]   Plaintiff had her own experience to communicate with foreign-language (her native) associate of the same utility as Mr. Shang, in earlier times, when she was carrying on 9-month project, requiring intensive verification of information. After some internal events her immediate supervisor disappeared from this project and she was continuing it herself, having the permission from higher supervisor to converse with auditee's associate about informational clarifications.

Soon, relatively, or not, Regulatory executive (before Wenqui Wang), retired now, introduced to Plaintiff a Russian speaking associate for communication.

Plaintiff successfully completed the project, never communicating with that associate in her native language, only in English that she considers a normal professional etiquette, and never attempted to switch to native language, besides first 2 introductory sentences, identifying themselves as common-language speakers: "Where are you from?" and "How long are you here?".

Even though Plaintiff never attempted to establish the kinship in Mr. Shang's manner, at some point, when DPS Chair, Gary Brown, was retiring, she got the friendly email-question from that associate: "Is Mr. Sayre a projected new Chair?".

The new Chair at that time was not publicly announced, so, obviously Plaintiff did not answer, and her higher-level supervisor appreciated that.

Thus, whenever there is a temptation for utilities to get the insider information, or so, or more, there is no law to forbid them to make that attempt, and the foreign languages create possibilities to make this uncontrollable with all consequences of multiple variations of potential violations of public trust, which DPS auditors are required to keep.

60. Concerned by public interest, jeopardized by violations in DPS: of laws and regulations; maladministration in promotions of not superior candidates; authoritarian ruling of regular work, forbidding of proper discoveries and results, banning the corrections of mistakes in models and methodologies; etc. which prevents the proper DPS decisions, and following the recommendation of Defendant-Scherer of contacting HR for more clarifications, Plaintiff used the occasion of 2018 Annual Assessment, and sent her self-assessment with all those explanations to DPS Chairman, Ethics Officer, HR Director, in addition to her Supervisor, Mr. Reubens on 05/21/2018.

61. As a response to her submission, per Plaintiff's perception, Ethic's Officer in about a month, distributed the reminder of Policy of Confidentiality, with Communications with Utilities rule. No other responses followed, but conversations in the neighboring cube seized and Plaintiff understood it as a positive reaction on this reminder.

62. However, later in September, Mr. Shang's active and loud friendly communication with audited Utility resumed. One day, on October 23, when Mr. Shang's conversation became longer and louder, Plaintiff send the email to Defendant-Canty as a reminder about Ethic's Officer distribution of Policy of Confidentiality and about their prior discussion with Plaintiff of Mr. Shang's secret talks with utility. Plaintiff added the OAAF Director to this email, as Directors of Offices are named responsible to implement this policy.

63. Defendant-Canty called Plaintiff in his cube and told her that she misunderstood the Policy (as he usually does to demean Plaintiff), Mr. Shang is not required to speak English, but he will do that only in *favor* to Plaintiff, but at any time if he decides not to do so, he is free not to do so.

64. Soon after that Mr. Shang returned back to his cube, apparently after talking with Deputy Director, called the Executive of Company-auditee and began his conversation at this time in English, starting with excuses for his English: "I need to speak in English now, because in the neighboring cube she complained about me and will complain again and all that [abusive language] …". Then he continued his professional conversation.

65. Plaintiff immediately sent the email to Defendant-Canty and OAAF Director with attempt to stop that unprofessional conversation with anticipation that he or somebody would come over and stop Mr. Shang, but there was no reaction.

66. At that time, Mr. Shang, finishing his conversation with executive, did his "favor" to Plaintiff, saying "I am going to China soon and I feel so unlucky because that F… Ukrainian F… my day … " and long stream of those abusiveness towards Plaintiff for about 7 – 10 minutes. In those 10 minutes Plaintiff was able to experience all range of feelings from shock, perplexity, confusion, to

disgust, walking in and out of cube thinking how to stop it: send another email or rush to Mr. Canty's office and invite him. She noticed her Supervisor in neighboring cube returned from meeting and she stopped there and pointed on Mr. Shang's cube. Supervisor, Mr. Rebuses responded quietly: "I hear that". Later he told Plaintiff that he reported that language to Management Team.

67. The "favor" from Mr. Shang was a brutal, sexually related, insulting language, which Plaintiff never heard towards herself in her entire life. It was extremely aggressive, and, considering his prior aggressive attack in 2014, when he let his hands waving in front of Plaintiff's face, she perceived this attack as his culminative verbal aggressiveness before it can turn into physical.

68. Plaintiff felt absolutely helpless, as management not only fails to defend her, quite opposite - it created this situation igniting the racial and national origin discrimination and harassment. Plaintiff reported this incident by email next day, 10/24/18 to DPS Chair/ DPS CEO, Deputy Chair, HR, Ethics Officer begging about her protection from Mr. Shang, but did not get any response.

69. Since that time, Plaintiff feels a shame, humiliation, and oppression from the aggressive sexually related words said publicly about her to ConEd executive, who knows her and worked with her on project in 2014 and may work again. Plaintiff considers this as not only a harassment based on her national origin, but even more is a sexual hostile incident, creating the sexual hostile environment and sexual harassment. Even though Plaintiff was always had those feelings of disgrace deeply inside, she was shy and not sure how to describe that in her prior Complaints to this Court. Considering the contemporary developments in that matter, Plaintiff now also claims her sexual harassment from Mr. Shang.

70. The contemporary Report of Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo form Attorney General's office (AG report) dated 08/03/2021 demonstrates: the words matter. Out of 9 former or current State employees, "Governor sexually harassed" 4 through individually interpreted "offensive and sexually suggestive comments" from Governor. Whereas Plaintiff was offended through terminology, always admitted as offensive and explicitly designated to sexual action, verbalized by Mr. Shang towards her numerously, for 10 minutes. Assuming that there are no double standards, then Mr. Shang's offence of Plaintiff is even more severe sexual harassment.

71. This sexual harassment was not only diligently silenced by management of OAAF and DPS and then turned against Plaintiff, it was cultivated by management of OAAF and DPS through malmanagement of prior harassment of Mr. Shang in 2014, through permissiveness and

forgiveness, support and promotions for him, but suppressions and retaliations against Plaintiff by Defendant-Stout, Defendant-Scherer, Defendant-Canty, Defendant-Balleau, Defendant-Congdon, Defendant-Kirnon with DPS Chair knowledge of this. They were adding oil to the fire for all those years, from 2014 till 2018, by setting on Mr. Shang against Plaintiff, disclosing to him the Plaintiff's concern of his secret talks, while Plaintiff never said anything against him directly to Mr. Shang (except when Defendant-Canty forced Plaintiff to tell her complaint in presence of Mr. Shang, which was unacceptable maladministration).

72. Wherein Defendant-Stout (with support of Defendant-Scherer, and Defendant-Canty, with help of HR Directors -current, Defendant-Balleau and former, Ms. Nissen - and Defendant- Kirnon, Chief Diversity Officer of GOER) was creating and was continuously pushing the illusory defamatory claim that Plaintiff was harassing or discrimination against Mr. Shang, swapping the victim and perpetrator, ignoring the law and violating it, defaming Plaintiff internally and making it public at Arbitration[9].

73. On October 30, 2018, Plaintiff suddenly discovered her invitation to counselling session at HR, on which she, not Mr. Shang, was an accused.  Despite all facts evidencing opposite, Plaintiff was accused again in Mr. Shang's discrimination!  Then, Director OAAF unreasonably condemned Plaintiff's recent work, for which Director gave her only 2-3 weeks for "wrapping up", when the necessity of re-doing was reported. Plaintiff was very proud of her difficult work done with unprecedented speed: changing methodology and completing the never finished in prior 6 years audit by 3 auditors of higher Grade. With agreement of her Supervisor, Plaintiff was redoing the audit, of which Director, apparently, was not informed, or not interested. Despite Plaintiff's repeating about methodology change and necessity of redoing to get to meaningful results, already gained by independent external auditors before, Director kept repeating "Just wrap it up!". The Plaintiff's nerves broke, and she summarized the discriminative and harassing attitude towards her by management and said: "I am НЕГР on plantation in this Office" with historical meaning of brutality of slavery in historical time, extrapolating it on herself.

74. The complete silence reigned in the room and Plaintiff understood that something might be not as expected or not correct and attributed the silence to the last phrase "I am НЕГР on plantation". Possibly they did not like the word "НЕГР". Plaintiff said it in Russian language, as "НЕГР" is

---

[9] (as will be explained later in details) Discrimination allegation is not applicable to Plaintiff, because she cannot make employment-related decisions in her lowest Grade; Harassment is not applicable, when there is no direct negative communication of perpetrator with victim (Plaintiff never said anything bad to Mr. Shang, when Mr. Shang to Plaintiff did).

official and polite in her former country, but it sounds close to known N-word (as Plaintiff discovered later, what N-word stands for). Or they did not like the word "Plantation", but Plaintiff heard that on national TV from Omarosa, Trump associate, when she was escorted from the Office, so this historical analogy is in use here as well. Plaintiff explained her saying: "This was the history of this country" with meaning this is just historical reference, no underlying meaning. The meeting was already half an hour longer than it was scheduled, so Ms. Balleau said: "We need to finish this session" and finished it normally, telling Plaintiff that she will forward her the requested links to Affirmative officers for Discrimination complaint. Ms. Balleau never did that. Instead, Ms. Balleau prepared Plaintiff's suspension a week later.

75. On November 9, Plaintiff was suspended and on May 20, 2019, after Arbitration, she was returned to work. Arbitration was considered in accordance to PEF Agreement Article 33, only "just cause" stipulation and concluded, there was "no just cause" to suspend Plaintiff with proposal of further termination. The Arbitration did not consider the case any further towards the Discrimination, Harassment, Retaliation, so on, as it was outside of PEF agreement and there were no resources and opportunities as only 2 days were assigned for Arbitration.

76. The restoration was stipulated with backpay for entire time except 5 days for the word "НЕГР". This fact Plaintiff considers inappropriate, discriminative based on national origin and violation of her constitutional rights of freedom of speech in favor of public interests. Besides that, it is a racial discrimination, as Plaintiff was offended by representatives of other races and those races got much more favorable attitude from Management due to their favorable legislative protection[10]. No one race should have any more legislative protection as any other! All races need to be equally protected under Anti-Discrimination Law, no matter what color (or no color) of skin, otherwise it is racism of one race or the other. This violates the Plaintiff's civil rights, protected by Title VII of Civil Rights Act, as Amended. protected by First, Fifth and Fourteenth Amendments. It also violates New York Consolidated Laws, Executive Law - EXC §296, Civil Service Law - CVS § 75-b.

---

[10] "42 U.S. Code § 1981 - Equal rights under the law
(a)Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is **enjoyed by white citizens**, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
*The Law stipulates, by definition, the white citizens enjoy all the rights, so they cannot suffer and do not need the same equal protection from other races, who are presumed not be able to do any harm to them. This makes "white citizens" to be the less legislatively protected and creates the common opinion that they do not need any protection in the US, which is a segregating approach.*

77. The expression was a historical reference, said by Plaintiff about herself, feeling deep moral pain from long-term harassment and discrimination, public disgrace, culminated in suspension. It was not insulting nor intended to be insulting to anyone of other two Caucasian Ladies, the Directors of HR and OAAF, conducted the counseling behind the closed doors on October 30, 2018, and as such cannot be construed as derogatory language, subject to punishment under Anti-Discrimination Law.

78. The word "НЕГР" was said in Plaintiff's national tongue, representing the national mentality, developed differently in under different historic, religious, educational traditions of the country. Ukraine, former URRS, former Russian Empire never enslaved the other nations, nationalities, nor races, besides their own. There are well-known historical facts of privileged respect to rare representatives of African races and there is a well-known history of many famous Russians originated from African nationalities from as early in history as 1705, time of Peter the Great who adopted African boy as his god son, Abraham. Abraham later took family name Hannibal (Gannibal in Russian pronunciation). He became highly educated Russian eminent military engineer, general, governor of Reval (now Tallinn, capital of Estonia) and nobleman, tracing his descendants through Russians to British aristocrats, royal family of Queen Elizabeth II. His son, Ivan, was prominent Russian military leader and a great-uncle of Russia's most famous and beloved poet, Alexander Pushkin, who raised his voice against tsar and the slavery of Russian peasants. The history of USSR gave another example of privileged respect to African Americans, attracted by new opportunities and immigrated there for better life. They became USSR pride and core propaganda against America with its racial intolerance.

79. The Anti-Discrimination Law recommends employers to be very careful, applying its stipulations as they may constitute the national origin discrimination by incorrect application. That is the case now.

80. It is well-known in linguistic psychology what is a native language – the initial inerasable picture of the world, reflected in deep words meaning. If the word "НЕГР" was absorbed in its respectful meaning at childhood, it never will have any negative connotation at any time of life, no matter how many restrictions will be posted on it later. The inner meaning will be the same, positive and respectful. So, it was impossible that word "НЕГР" was used by Plaintiff in any negative connotation. In that phrase it was used as a reproof for bad treatment of Plaintiff now as it was then at historical times. It was a bad treatment, not a bad person meaning.

81. The re-phrase Plaintiff's statement into "not a НЕГР on plantation" is a false, and a Defamation of Character. That phrase has a different, negative refusing meaning "I will not do that because I

am not НЕГР", rather than reproaching in bad treatment of good people, as it was meant by Plaintiff. It was very inappropriate for American Arbitration Association under New York governing law to pick up and use the phrase out of Plaintiff's context

82. Chief Diversity Officer of GOER, Elatisha Kirnon, once refused to open the investigation in September 2018 of Plaintiff's reasonable complaint about Plaintiff's discrimination, in violation of due process, established for promotion of State Employees, now was actively supporting Plaintiff's illegitimate Suspension, by biased "conclusions" against Plaintiff - that makes a good cause to believe that Defendant pursued personal racial agenda, being representative of other than Plaintiff race.

83. Considering all Plaintiff's proofs and arguments: the allegation is inappropriately taken out of context; the national origin mentality-meaning of it; the requirement of Anti-Discriminative Law for employers to be thoughtful when applying / asserting the national origin discrimination - the initial accusation of use "racially discriminatory term" is inapplicable to Plaintiff.

84. The allegation of "acts of discriminatory conduct and the use of … discriminatory terms" is not applicable to Plaintiff either. There was no "discriminatory conduct" noticed in Plaintiff's behavior or mentioned in Plaintiff's Notice of Discipline (NOD), nor anywhere else. The "discriminatory terms" are not subjects of any Law. The subjects of Anti-Discrimination law are actions of Discrimination or Harassment. None of those are applicable to Plaintiff nor to her whistleblower reports. Discrimination requires the fact of adverse employment-related decision towards somebody with protected characteristics. By definition, it is not applicable to Plaintiff due to her lower Grade and no supervisory authority, no any other authority for employment-related decisions. Successful promotion of Mr. Shang to Management level evidences opposite. Harassment requires direct influence (by notes, talks, jokes, signs) directly delivered to affected employee. Nothing like that ever happened in Plaintiff's employment or life. Neither they are applicable to Plaintiff's whistleblower reports to MT or Chair, or anybody of higher management. Thus, all and any Notices of Suspension, NOD, actions and reports of managing personal about Plaintiff are false and as such they are defamation of Plaintiff's character serving the purpose of her retaliation, discrimination and harassment, thus subjects to all applicable laws and punishments.

85.  The actions in that matter of OAAF Director, HR Director, HR Associate Director of HR, DPS Deputy Chair, and their supporter Elatisha Kirnon, Chief Diversity Officer of GOER, and are inappropriate, discriminative, harassing, retaliating and defaming of Plaintiff's character. They violate the Title VII of the Civil Rights Act, as Amended, and Plaintiff's constitutional right to

freedom of opinion expression in public interest, protected by First Amendment in addition to violation of Due Process, protected by Fifth and Fourteenth Amendments. They also violate New York Consolidated Laws, Executive Law - EXC §296, Civil Service Law - CVS § 75-b.

86. The Arbitration, finalized on May16, 2019, was limited to decision on Article 33 of Agreement between PEF, Public Employees Federation union, and State of New York. It had a scope of only to decide upon the existence of "just cause" to suspend the Plaintiff. The Arbitrator dismissed the "just cause" to suspend but admitted to "just cause" to discipline the Plaintiff for "the use of racially discriminatory terms", which is painful discrimination and defamation of Plaintiff.

87. As Plaintiff explained before, the specific word "НЕГР" relates not as much to language as to a national origin mentality, to intellectual perception of substance of this word. It even does not matter in which language it is said: "NEGRO", "black", in Spanish, "NEGRE", the same in French, or "NIGRUM, NIGREOS", the same in Latin – it is always polite word, neutral of any racial or other negative connotation, if it was initially absorbed as such, as it was for Plaintiff.

88. The Arbitrator's (Mary L. Crangle) reasoning, given in her Decision from May 16, 2019, was based solely on her presumption that Plaintiff did not "suddenly switch to an allegedly neutral Russian word" … "NEGR for people of color" … "when she was speaking, in English" and her belief that Plaintiff "knew what she was saying". This reasoning has no credibility at all. First, The Arbitrator is not bilingual person and as such she may no know that switching between languages is normal for bilinguals. Second, "speaking" was only a phrase "I am НЕГР on plantation" after long silent listening of OAAF Director's undeserved criticism. "Plantation" in Russian is "plantatsia" – not a big difference. Third, nobody on Arbitration at any time asked Plaintiff to say the word to hear how it sounds – it sounds undetectably the same as "N-word". Fourth, no one of Diversity champions, neither at DPS, nor at GOER, or Arbitration was bothering with understanding what diversity really is and how mentality of language is determinative. For Plaintiff "people of color" sounds extremely racist as it is segregating in substance.

89. And the most important, Plaintiff did not break any Law. The word was said about Plaintiff herself, not in public, with only 2 people around, not of that race, in not offensive context, in its historical reference meaning, of which Plaintiff said at that time and in her further written explanation. This is not a subject of Discrimination, nor Harassment. Why Plaintiff was brutally punished, and her reputation was defamed. Why the native language of Mr. Shang had been so cared of and so protected; why Mr. Shang's abusive language towards Plaintiff brought him the

further promotion, and only Russian 1-word crushed Plaintiff's life? This is an exhaustive Discrimination, Plaintiff's harassment, violation of Human rights and defamation.

90. Arbitrator, in her Decision, took a liberty to make the recommendations about Plaintiff's job performance, which was not discussed during the Arbitration. In relation to Whistleblower protection law she advised that Plaintiff "must likewise find a way to focus on her job duties and not on the perceived shortcomings of her co-workers. If she cannot, she places her future employment with the Department at risk", which contradicts the essence and necessity of Whistleblower law and is a violation of that law and is defamation of its application.

91. Regarding uncharged misconduct, Arbitrator agreed with DPS that by tearing her own Certificate and not shaking hand of presenter Plaintiff committed the misconduct. This statement again is a discrimination against Plaintiff of her national origin, as shaking hands is not considered hygienic in Ukraine and not a custom between the man and woman in Plaintiff's culture. Considering the new CODID-19 reality it is not norm in the US and will stay as such as it was in Ukraine, so this defamatory conclusion must be void. Also void should be the notion about Plaintiff's tearing her own Certificate. It was publicly demonstrated on Public TV how Nancy Pelosi ripped Mr. Trump's State of the State at the end and how Mr. Trump did not shake her hand in the beginning. The double standards are not appropriate rule or regulation, nor a law, so Arbitrator should not be engaged in the offensive, defamatory advises and conclusions.

92. Plaintiff was and is deeply disgraced by the stamp on her as a racist, initiated by Defendant-DPS and published upon arbitration decision on May 16, 2019. Plaintiff, who was born and raised in the country, which never-ever had racial problems, which education, long country history and entire culture was about that tolerance[11], which famous and well followed Russian ethnologist, anthropologist, and biologist Nicholas Miklouho-Maclay, explored and lived for some time from early 1860 among the tribes of New Guinea (taking his name afterwards as they call him) proving that there are no lower races on the earth, when Frederick Douglass in the same time was still hiding in England from his master, having the risk to be returned into his slavery, is deeply ashamed.

93. One of the main reasons to file this lawsuit was to take off the burden of that defaming shame of claimed racist. The Arbitration discussed the substance of that racial claim only in couple of

---

[11] Famous and well followed Russian ethnologist, anthropologist, and biologist Nicholas Miklouho-Maclay, who explored and lived for some time from early 1860 among the tribes of New Guinea (taking his name afterwards as they call him) was already proving that there are no lower races on the earth. At that time Frederick Douglass was hiding in England from his master, having the risk to be returned into his slavery

sentences only with a purpose to assess the excessiveness of suspension and not anything else. Plaintiff believes that decision was made on wrong, unexplored premise in relation to only one-word НЕГР, without any further or deeper or surrounding considerations.

94. The Plaintiff, however, is not challenging that decision, as it was not originated there. But it was made public upon the report issued on May 16, 2019. After that day anyone, going through arbitration in the US is having the access to that decision. It was created purposely by Defendant-DPS and kept as confidential in internal documents and was not public and would never become public, so it would not be a defamation, if Arbitrator had not issued that report. The charge of 5 days was very surprising to Plaintiff and her lawyers. That charge placed the defaming racist stamp on Plaintiff.

95. However, the fault of that is on Defendant-DPS, allowed that happen, and on each Defendant, participated in suspension on that matter, purposely enforced that defamation to damage Plaintiff's reputation and destroy her career up to termination. The employer is required by Anti-discrimination law to impose the charge and use that law thoughtfully and carefully, not the arbitrator, as arbitrator is not employer.

96. Therefore, those Defendants-managers are responsible for defaming Plaintiff, which Arbitrator just made it public, which was obvious, known and anticipated by those Defendants result, thus they are participants of publishing of their defamation on May 16, 2019.

97. This shame and defamation are not only for Plaintiff. This shame and defamation are on the entire Ukrainian and Russian nations, as that word НЕГР is still used there as normal word, comparing to "BLACK" (in Russian language "чёрный"), which is a complete disgrace and offence, and it sounds like it is not related only to skin it is related to the soul and life and everything of the person and has the same root as "devil" ("чёрт") in Russian language.

98. The problem of that word exists only in the US. Even Canada takes it much easier, as archaic. Even easier in Europe, and opposite in former USSR countries, where "Black" – is a racial slur.

99. Forcing Plaintiff to say "BLACK" in Russian towards the human is a moral torture, as in Plaintiff's linguistic mind and nature, she is offending the person and using the slur.

100.   The word НЕГР is short of НЕГР-oid, an official anthropological race, one of 3 most expanded on the earth. Nobody eliminated that. Nobody eliminated the name of the country Nigeria, or river Niger in Africa, or the same Latin word, meaning black with the same configuration in Spanish and French and maybe some others.

101.   Defaming Plaintiff as racist for that only word will not resolve the problems in the US. That is a wrong way to resolve the problem at all. The way is studying of history, achievements of

famous people of that race in the US and other countries, like Alexandr Pushkin, his great
grandfather Abraham Gannibal, famous French writer, Alexandre Duma, etc. The simple
knowledge that there is no basis for racism, which was a theory of well and not well-developed
races, will be more helpful than defamation. It is already proven by human's genome and
paleontology that all humans on the earth are originated from Africa and have one "Mitochondrial
Eve" and "Y-chromosomal Adam".

102.     In that matter, Plaintiff does not see any reason, substance, or matter to continue being
defamed for this word

## CAUSES OF ACTION

103.     Causes of actions in this Complaint were considered under the following premises:

104.     Defendant, Department of Public Service, DPS, is a Government Agency, whose primary
concern is to properly serve the public and its interest. Their serving processes get performed
through Rate Cases, other Cases, Petitions and other elements of Government Due Process. Thus,
any action of DPS, internal or external, is related to public interest and adherence to Government
of New York due process.

105.     Plaintiff is employed by DPS, Staff for Public Service Commission, thus Plaintiff's concerns
of improper actions of DPS are primary related to Public Interest and adherence to Government of
New York Due Process as time, efforts, decisions, results are in a stream of the main mission and
main serves subordinated to public expectations of proper Due Process

106.     Plaintiff's feelings, brain function, considerations, decisions, and resulted in actions, are not
controlled by Employer's, DPS, time.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983: FREE SPEECH, First, Fifth, and Fourteenth Amendments,
### 42 U.S.C. § 2000e *et seq.* TITLE VII of the Civil Rights Act of 1964, as amended
### New York Consolidated Laws, Executive Law - EXC §296; Civil Service Law - CVS § 75-b
### Defamation)
### Defendants: State of New York, DPS, Doris Stout, John Scherer, Timothy Canty,
### Christine Balleau, Thomas Congdon, Elatisha Kirnon

107.    Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

108.    Plaintiff alleges, that at all times relevant herein, Defendants were contemplating, or participating, or effecting, or engaging, or not interfering in, or creating conditions for continuation of harassment and discrimination against Plaintiff based on her race and national origin, by privileged support for personnel of different race and national origin, which continuously making inappropriate statements, attacking and offending Plaintiff, culminated in sexual harassment.

109.    Plaintiff alleges, that at all times relevant herein, were contemplating, or participating, or effecting, or engaging, or not interfering in, or creating conditions for denial of Plaintiff equal protection and due process, depriving Plaintiff's life-defining property of decency, dignity, values of reputation, and respectful employment, which otherwise would flourish into advanced career and prosperity had that denial not existed.

110.    Plaintiff alleges, that at all times relevant herein, Defendants were contemplating, or participating, or effecting, or engaging, or not interfering in, or creating conditions for the violation of whistleblower protection law.

111.    Plaintiff alleges, that at all times relevant herein, Defendants were contemplating, or participating, or effecting, or engaging, or not interfering in, or creating conditions for causing Defamation of character by accusations unsupported neither by Law nor by any actions of Plaintiff, starting igniting, and / or further supporting Plaintiff's harassment and used the defamation in further discrimination against Plaintiff's destroying her dignity, decency, respectful employment, equal work distribution, appreciation for results and inhibiting promotion.

112.    Plaintiff alleges, that at all times relevant herein, Defendants were contemplating, or participating, or effecting, or engaging, or not interfering in, or creating conditions for violation of Plaintiffs' First Amendment rights to defend the public interest and have a liberty from organized and / or supported retaliation in that matter in violation of Constitutional right, protected by 1st Amendment.

113.    Plaintiff alleges, that at all times relevant herein, the Defendants were contemplating, or participating, or effecting, or engaging, or not interfering in, or acting inappropriately, or creating conditions for violation as set forth herein constitutional rights, protected by First Amendment, by organizing the retaliation for Plaintiff attempts to defend the public interests and trust in: unbiased government decisions, not affected by secret conversations of employees in the Office of Accounting Audits and Finance, Department of Public Service; correctness of models and

calculations affecting government decisions and ratepayers monies; effectiveness, pace, and quality of government service.

114.     I filed charges with Equal Employment Opportunity Commission regarding the alleged discriminatory acts on or about:

09/30/2019

(Provide Date)

115.     The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter (**copy attached**) which was received by me on or about:

01/17/2020

(Provide Date)

116.     The plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

117.     The defendants are an employment agency or labor organization within the meaning of 42 U.S.C. § 2000e(b), (c), or (d).

118.     The defendant(s) is (are) engaged in commerce within the meaning of 42 U.S.C. § 2000e(g).

## PRAYER FOR RELIEF

**WHEREFORE,**

Plaintiff respectfully prays for the following relief against Defendants:

a) Declare the acts of the Defendants to be a violation against Plaintiff and her rights;

b) Declare the elimination of double standards and favoritism for any nationality and race on any Government level;

c) Declare the elimination of disparity in legislative protection among all and any races in the United States;

d) Declare the elimination of any discrimination against any nationality and/or race from any other nationality and/or race;

e) Declare the necessity of appropriate trainings / exams, especially among the Management, with Law study, its application and prioritization to the level necessary to avoid such inappropriate actions at any time further;

f) Remove all the negative and other inappropriate records from Plaintiff's employment records associated with this Complaint including contemporary times, before and after first filing till the final Order;

g)  Restore Plaintiffs reputation, ruined by inappropriate actions as set forth in this Complaint;

h)  Remove the records of Ceremony "misconduct" as self-eliminated due to latest events;

i)  Award Plaintiff the refund of penalty of 5 days salary with interest from the first day of suspension;

j)  Award Plaintiff the economic damages of lost opportunities due to defamation and retaliation;

k)  Award Plaintiff general and/or compensatory damages in an amount to be determined at trial for damages of emotional distress, reputational harm, and humiliation for defamation and retaliation;

l)  Award Plaintiff nominal damages pursuant to statute;

m)  Award Plaintiff punitive damages for defamation and retaliation in an amount to be proven at trial;

n)  Award Plaintiff prejudgment and post-judgment interest at the maximum rate allowable by law;

o)  Award Plaintiff costs, interest and other reasonable and nominal fees for this action pursuant to 42 U.S.C. §1988 and other relevant statutes;

p)  Award Plaintiff the costs of suite as incurred in this action and attorney's fees; and

q)  Award Plaintiff all other and further relief as the Court may deem just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: _____05/06/2020___

_____
Signature of Plaintiff