**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
─────────────────────────────────────────

**OLENA MILITINSKA-LAKE,**

                        **Plaintiff,**

    **v.**                                 **1:20-CV-443**
                                           **(TJM/CFH)**


**STATE OF NEW YORK DEPARTMENT OF**
**PUBLIC SERVICE, et al.,**

                        **Defendants.**

─────────────────────────────────────────

**THOMAS J. McAVOY,**
**Sr. U. S. District Judge**

### DECISION & ORDER

Before the Court is Defendants' motion to dismiss Plaintiff's Second Amended

Complaint.  See dkt. # 54.  The parties have briefed the issues and the Court has

determined to resolve the matter without oral argument.

## I.   BACKGROUND

This *pro se* civil action arises out of Plaintiff Olena Militinska-Lake's employment as

a Senior Auditor with the New York State Department of Public Service (DPS).  She

worked in the Office of Accounting Audits and Finance ("OAAF").  The Court previously

granted the Defendants' motion to dismiss an earlier version of this action, but permitted

Plaintiff to file a second Amended Complaint.  See Second Amended Complaint ("Cmplt."),

dkt. # 33.  After Plaintiff filed that Complaint, Defendants filed the instant motion.

Plaintiff raises a variety of state and federal claims against her employer, DPS, and

1

various supervisors.  She alleges that she faced discrimination because of her race and national origin.  Cmplt. at ¶ 6.  She contends that the discrimination manifested itself in a failure to promote, unequal terms and conditions of employment, retaliation, suspension without pay, and harassment based on race and national origin.  Id. at ¶ 7.

Plaintiff is an American citizen who was born in Ukraine.  Id at ¶ 8.  She naturalized in 2007.  Id.  While Plaintiff speaks fluent English, her native languages are Ukrainian and Russian.  Id.  Plaintiff has advanced degrees in accounting and taxation from the State University of New York at Albany ("SUNY-Albany"), as well as a Master of Science degree in economics and political economy from Kiev State University in Ukraine.  Id. at ¶ 9.  Plaintiff also did doctorate level work at SUNY-Albany.  Id.

Plaintiff received her appointment as a Senior Audior, salary grade 18, at DPS on April 23, 2009.  Id. at ¶ 10. During ten years of service to the State, Plaintiff received only satisfactory assessments.  Id. at ¶ 11.  She received recognition as a valuable contributor and "one of the best auditors" by her employer.  Id.

Plaintiff received an award for ten years of dedicated service at a ceremony on November 8, 2019.  Id. at ¶ 12.  At around 5 p.m. on the next day, Plaintiff received a notice of suspension from Defendant Thomas Congdon, Deputy Chair and Executive Deputy of the Public Service Commission.  Id. at ¶ 13.  Defendant Christine Balleau, DPS's Director of Human Resources and non-defendant Roger Halbfinger, Associate Director of Human Resources for DPS, were also present.  Id.  The notice stated: "effective immediately, you are suspended without pay due to acts of discriminatory conduct and the use of racially discriminatory terms."  Id.

Plaintiff's Second Amended Complaint narrates the background of Plaintiff's alleged

2

mistreatment in the workplace on the basis of her race and national origin.  She alleges

that on March 18, 2014, Shang ("Jerry") Hongbing, a co-worker who had a higher pay

grade and "supervisory responsibilities," "committed a brutal harassing attack on Plaintiff

based on her national origin."  Id. at ¶ 14.  On that day, two days after Russia had annexed

Crimea from Ukraine, Shang confronted Plaintiff in a hallway, "blocked her exit, and

starting making T-signs (timeout) in front of Plaintiff's face," nearly hitting her.  Id.  "Time

out!" Shang stated, "No discussion! You are Ukrainian, you must not like what Putin did in

Ukraine, don't you?"  Shang told Plaintiff that he liked the annexation, "because China

supports Putin!"  Id.  Plaintiff said nothing, but simply tried to "escape" Shang.  Id.

Plaintiff reported this "attack" to the OAAF Director, as well as other "jokes" made by

another employee, John Huang.  Id. at ¶ 15.  Plaintiff alleges that her employers failed to

take the matter seriously, even after Shang continued his alleged "harassment."  Id.

Plaintiff felt "deeply insulted personally by Mr. Shang's aggressive gestures and even more

insulted on behalf of all Ukranians, whose wound is very deep with that annexation and the

following war."  Id.  Plaintiff felt equally "insulted as a naturalized American, whose

citizenship is also subjected to the Oath to America, its interests and constitution, not to

China."  Id.  Plaintiff "follows [that Oath] diligently."  Id.

Plaintiff alleges that the subject of Russian actions in Ukraine in 2014 was a

"touching" one for her, since "her entire family lived" in Ukraine at the time "and her

youngsters, Doctors, were under potential total mobilization."  Id. at ¶ 16.  Shang's alleged

harassment on the matter and the "adverse positions and actions of Management towards

Plaintiff" led to "stess" and a "related life-threatening health condition."  Id.  Plaintiff began

suffering the condition in early June and received a diagnosis in September 2014.  Id. at ¶

3

16.  Plaintiff relates that she "was operated on 09/11/2014 and following [sic] treatment during the next 9 months.  Id. at ¶ 16 n.1.  "Because Plaintiff is not in any risk groups (alcohol, tobacco, drugs, obesity, etc.), the only cause of this health condition the doctors give is stress."  Id.

Instead of responding to Plaintiff's complaints about Shang's harassment, Plaintiff alleges that the OAAF Director sent a memorandum dated October 15, 2015 that cited Plaintiff for a "'particularly hateful note apparently addressed at [Shang's] Chinese roots . . . considered a form of harassment based on his ethnicity'" that was "'prohibited behavior'" and an "indication of harassment'" after "Plaintiff reminded [the] Director about the value of [the] Naturalization Oath, as a prerequisite for citizenship, and a citizenship as requirement for Government employment."  Id. at ¶ 17.  Plaintiff complains that the OAAF Director did not follow workplace rules in investigating Shang's harassment.  Id. at ¶ 18.  Instead, the "Director reprimanded Plaintiff at a counseling session with" Human Resources.  Id.  he placed a memo in Plaintiff's file, which Plaintiff contends served as retaliation and "inhibit[ed] Plaintiff's" ability to obtain promotions.  Id.  That action, Plaintiff claims, also "depriv[ed]" her of "the dignity of her respectful existence in OAAF and advancement of her career."  Id.

Plaintiff contends that the actions of the Director and HR violated a variety of her rights under federal law, the United States constitution, and New York law.  Id. at ¶ 19.  She contends that the discrimination she faced included the October 29, 2015 memo, and continues until the present day.  Id. at ¶ 20.  "After that event," she claims, "the deterioration of [her] career and deprivation of dignity in the Office began and her position on the Organizational Chart was frozen at the bottom."  Id.  In early 2015, Plaintiff "was

4

rotated out of" a "prestigious" job in the "major utility sector." Id. at ¶ 21.  This rotation

came even though Plaintiff engaged in "selfless work and" made "significant findings in

major Utility's Sandy Storm audit." Id.  The OAAF Deputy Director, Defendant John

Scherer, "abusively rejected" those findings. Id.  This rejection came at the same time that

Plaintiff "fought for her life with [a] threatening health condition, being considered disabled."

Id.  Plaintiff alleges that, during the period when she suffered from a disability–"second half

of 2014–first half of 2015 and the next 3 years afterwards, per [the Americans with

Disabilities Act]–she continued to work "fruitful[ly]" on various projects from 2015-2017. Id.

at ¶ 22.  At the same time, Defendants "were developing the destructive and defaming

retaliating activity against" her. Id.  This conduct, Plaintiff claims, "complicat[ed]" her "fight

for life against [a] life-threatening health condition." Id.  Defendants, Plaintiff claims, filled

her personnel file with criticism, and she underwent "multiple counseling" sessions and

"interrogations" in January and April 2017. Id.  Plaintiff alleges that the "Directors of HR

and OAAF, and Deputy Director of AOOF, fabricated disparaging 'evidence' and subjected

Plaintiff to [a] disgraceful psychological evaluation at Employee Health Service[.]" Id.

Defendants proposed an unpaid leave of absence for one-year, which did not occur. Id.

Plaintiff contends that this "mentally harassing activity continued until Plaintiff . . . proved to

HR (04/27/2017)" that such conduct amounted to "discrimination and harassment." Id.

Plaintiff's Second Amended Complaint also describes Defendants' investigations

into alleged harassment against the Plaintiff. See Id. at ¶¶ 24-25.  Plaintiff contends that

these investigations were flawed and ignored the harassment that she faced. Id.

Investigators favored Shang and ignored his misconduct, which included speaking with

persons he audited in a language other than English. Id. at ¶ 25.  Plaintiff also complains

that supervisors ignored her suggestions for auditing improvements, shifted her to work that was less challenging and lower priority, and passed her over for promotions, rewarding people who were less capable. Id. at ¶¶ 26-27, 29-30. Shang in particular benefitted, though Plaintiff's work was superior. Id. at ¶ 33. Defendants also offered baseless criticism of Plaintiff's work and diminished her contributions. Id. at ¶ 28.

Plaintiff again had conflict with Shang when he returned as her "cube neighbor" in January 2017. Id. at ¶ 36. Shang had been promoted and served, unofficially, as "Account Executive Auditor of one of the major Utilities." Id. Plaintiff noticed that when Shang had phone conversations with this utility he spoke in another language, "most likely" Shang's "native language (his language)." Id. at ¶ 37. "After naming the Utility Executive on the phone," Plaintiff alleges, Shang spoke about professional and personal matters in his native language. Id. Plaintiff alleges that conversations with a utility are to remain confidential. Id. at ¶ 38. Beginning in July 2017, Plaintiff went to Defendant Timothy Canty, Deputy Director of OAAF, to express her concerns over Shang's conversations. Id. at ¶ 39. Janice Nissen, HR Director for OAAF, informed Plaintiff that no English-only policy existed at DPS. Id. Plaintiff alleges that from this, "Canty concluded that Mr. Shang can talk any language he wants, any time he wants, with anybody he wants." Id. Canty decided that any restrictions on language would be discriminatory. Id.

Plaintiff next alleges that on January 22, 2018, she heard Shang discuss the auditing process with an official from Consolidated Edison, immediately after the lead auditor for that utility had discussed the process with the group. Id. at ¶ 40. Shang had returned from the meeting, Plaintiff alleges, and immediately phoned the Regulatory Executive for ConEd. Id. Shang shared with the executive the names of the people on the

6

audit team and their responsibilities.  Id.  Plaintiff claims that Shang began speaking in

another language and "loudly giggling and laughing."  Id.  "It was very unpleasant," Plaintiff

claims "to hear such talking about Plaintiff's colleagues, not knowing what the giggle was

about."  Id.

Plaintiff felt she had to report this conversation.  Id. at ¶ 41.  Plaintiff went to the

team lead, "who listened to her carefully, thought for [a] couple fo seconds, and said that

possibly he is describing the responsibilities of . . . team members, which she is thinking to

do briefly later."  Id.  The lead decided that "it is OK with her that [Shang] did it first."  Id.

The lead stated that she would speak to Canty about the issue.  Id.  Plaintiff "decided" that

she needed to "speak to Defendant Canty herself to describe the unpleasant situation."  Id.

She decided to take advantage of Canty's stated open-door policy.  Id.

The conversation with Canty did not go as Plaintiff had hoped it would.  Id. at ¶ 42.

Canty suggested that they "invite Mr. Shang to this conversation" where Plaintiff could "say

what she wants to say."  Id.  Plaintiff alleges that inviting Shang into the meeting violated a

fundamental tenet of management: "Do it yourself.  Never involve any other subordinates

into the problem, nor let anyone do it for you."  Id.  At the meeting, Shang complained that

Plaintiff had conversations in Russian.  Id. at ¶ 43.  Plaintiff contends that all of her

conversations in Russian were personal conversations, not business ones.  Id.  She

complains that Canty ignored this difference and allowed Shang to "continue to violate the

law and all regulations[.]"  Id.  Canty did not reprimand Shang for attacking Plaintiff's use

of her native language in private conversations.  Id.

Plaintiff further alleges that the Department does not understand policies about the

use of English in the workplace.  Id. at ¶ 44.  In an effort to avoid claims of discrimination,

7

Plaintiff claims, "managers swing in to the complete language freedom," and permit workers to speak in other languages. Id. Plaintiff points to an e-mail she received from Christine Balleau when she returned to work on June 17, 2019 that stated that "'Employees may use foreign language to communicate in the workplace if it doesn't exclude other appropriate parties from the discussion.'" Id. Plaintiff points out that the Department requires employees to have fluency in English as a condition of appointment, including for auditor positions. Id. at ¶ 45. Plaintiff argues that failing to require English as the language of the workplace would create confusion and undermine public trust because there would be no means to ensure that "auditors are unbiased and not making their own interest related decisions, or holding their own business under the agency's cover[.]" Id. at ¶ 46. Plaintiff alleges that Shang violated the language policy by conducting business conversations in a language other than English when both people in the conversation could speak English fluently. Id. at ¶ 49. Plaintiff further contends that using English as the language of business serves other business and ethical requirements. Id. at ¶ 50. Plaintiff contends that Defendants discriminated against her by acting in a "permissive" way towards Shang's use of a language other than English at work. Id. at ¶ 52.

Plaintiff alleges that, after her complaints to Canty, Shang's use of language other than English at work "became more loud, longer, and friendly." Id. at ¶ 53. Plaintiff complained to the Deputy Director, Defendant John Scherer. Id. During a conversation on March 31, 2018, Scherer informed Plaintiff that he feared prohibiting the use of languages other than English in the workplace could be considered discrimination on the basis of national origin. Id. at ¶ 54. Plaintiff alleges that Scherer spoke to her disrespectfully, telling her to "'Do your work rather than looking around and complaining.'" Id. She claims that

8

telling her to ignore others speaking a language other than English amounted to discrimination because of Plaintiff's national origin because Scherer "ignor[ed] her complaint about [a] language isolation problem (within a group around her with the same of Mr. Shang's native languages, actively used in business discussions)," and this caused a problem because Plaintiff is not a native English speaker "and it requires for her more brainwork and concentration and it is very distracting when a third, unknown, language is actively used around" her.  Id.

Plaintiff also alleges that, in 2013, she experienced a reprimand for speaking in a Slavic language during lunch time with a physical therapist.  Id. at ¶ 57.  Plaintiff contends that Scherer had forbidden her to have "any non-English conversations in the Office, violating her Title VII" rights.  Id.

Plaintiff further alleges that Shang's conduct represented an impermissible familiarity and interpersonal relationship with a party being audited, conduct which violated ethics rules and laws.  Id. at ¶¶ 58-59.  Plaintiff alleges that, on May 21, 2018, she attempted to inform her employer about concerns with Shang's conduct and the operation of the Department.  She describes her actions as:  "[c]oncerned by public interest, jeopardized by violations in DPS of laws and regulations; maladministration in promotions of not superior candidates; authoritarian ruling of regular work, forbidding of proper discoveries and results, banning the corrections of mistakes in models and methodologies; etc., which prevents the proper DPS decisions, and following the recommendation of Defendant Scherer" to "contac[t] HR for more clarifications" Plaintiff used her 2018 annual assessment and self-assessment to raise these issues with the "DPS Chairman, Ethics Officer, HR Director, [and] her Supervisor, Mr. Reubens[.]"  Id. at ¶ 60.  The only response

9

to this submission came in the form of a reminder of the DPS policy of confidentiality and rule on communicating with utilities.  Id. at ¶ 61.  Shang's conversations ceased for a time. Id.

The conversations about which Plaintiff complained resumed in late September.  Id. at ¶ 62.  After a particularly long and loud conversation on October 23, Plaintiff emailed Canty to remind him of the "Policy of Confidentiality and about their prior discussion with Plaintiff of Mr. Shang's secret talks with [the] utility."  Id.  Plaintiff included the OAAD Director in this email.  Id.  Canty summoned Plaintiff and informed her that "she misunderstood the" language policy.  Id. at ¶ 63.  Plaintiff claims that Canty "usually" claimed Plaintiff misunderstood the policy "to demean" her.  Id.  Canty told plaintiff that "Shang is not required to speak English, but he will do that only [as a] *favor* to Plaintiff, but at any time if he decides not to do so, he is free not to do so."  Id. (emphasis in original). Shortly after, "apparently after talking with [the] Deputy Director," Shang made a phone call to the person he had previously spoken with.  Id. at ¶ 64.  Shang spoke in English, telling that person that "'I need to speak in English now, because" Plaintiff "complained about me and will complain again and all that [abusive language]."  Id.  Shang then continued with the "professional conversation."  Id.

Plaintiff again emailed Canty and the OAAF director in an effort "to stop that unprofessional conversation," but nothing happened.  Id. at ¶ 65.  Shang responded by complaining to the executive that "I am going to China soon and I feel so unlucky because that F . . . Ukrainian F . . . my day," followed by a "long stream of those [sic] abusiveness towards Plaintiff for about 7-10 minutes."  Id. at ¶ 66.  During that time, Plaintiff felt "shock, perplexity, confusion" and "disgust."  Id.  Plaintiff's supervisor overheard the language and

10

reported the conversation to management.  Id.  Plaintiff had never heard such "brutal" and "sexual" language in her life.  Id. at ¶ 67.  She alleges that this language was similar to such "prior aggressive" language in 2014.  Id.  Plaintiff feared the confrontation would turn physical.  Id.  The next day, October 23, 2018, Plaintiff sent an email to the "DPS Chair, DPS CEO, Deputy Chair, HR, [and] Ethics Officer" seeking protection from Shang.  Id. at ¶ 68.  She got no response.  Id.  Plaintiff contends that Shang's conduct represented both harassment based on her national origin and sexual harassment.  Id. at ¶ 69.  Plaintiff contends that management never addressed Shang's misconduct towards her between 2014 and 2018, which exacerbated the situation.  Id. at ¶ 71.

Instead, Plaintiff claims, management accused Plaintiff of harassment and discrimination towards Shang.  Id. at ¶ 72.  Plaintiff discovered on October 30, 2018 that she had been invited to a Human Resources counseling session.  Id. at ¶ 73.  To her surprise, Plaintiff found that she, not Shang, was accused of discrimination.  Id.  Plaintiff also faced criticism for her recent job performance and pressure to complete a difficult task in an unreasonable amount of time.  Id.  The Director repeatedly told Plaintiff to "Just wrap it up!," and Plaintiff, frustrated by the continual discrimination and harassment she allegedly faced, stated that "I am НЕГР on plantation in this Office."  Id.  Plaintiff alleges that she intended this phrase to refer to the "historical meaning of brutality in historical time, extrapolating it on herself."  Id.  The other people in the room responded to this statement with "complete silence," and "Plaintiff understood that something might not be as expected or not correct."  Id. at ¶ 74.  Plaintiff thought that perhaps people did not like her use of the phrase "I am НЕГР on plantation," or perhaps the word "НЕГР."  Id.  While the word is "official and polite" in Ukraine, "it sounds close to known N-Word."  Id.

11

Plaintiff was suspended from work on November 9, 2018.  Id. at ¶ 75.  Plaintiff

returned to work on May 19, 2019, after an arbitration proceeding.  Id.  The arbitration

proceeded pursuant to a union agreement.  Id.  Per the agreement, the arbitration did not

discuss Plaintiff's claims of discrimination and harassment.  Id.  Plaintiff received back pay

for the entire period except for five days related to Plaintiff's use of the word "НЕГР."  Id.

Plaintiff alleges that suspension for use of that word represents discrimination based on

national origin and a violation fo her First Amendment rights.  Id.  She also contends that

she suffered racial discrimination because she was treated differently than others of

different races.  Id.  Plaintiff claims that her language "was not insulting nor intended to be

insulting to anyone[.]"  Id. at ¶ 77.  The word in question, Plaintiff claims, comes from

Russian, and Russia has a history of opposition to racism.  Id. at ¶ 78.  Plaintiff used the

word to refer to "bad treatment of good people."  Id. at ¶ 81.  Elatisha Kirnon, Chief

Diversity Officer of the Government Officer of Employee Relations, who had earlier refused

to take any action on Plaintiff's earlier harassment and discrimination complaint, now

supported Plaintiff's suspension.  Id. at ¶ 82.

Plaintiff alleges that the complaint against her was unfounded; she did not engage in

any conduct that could be defined as discriminatory.  Id. at ¶¶ 83-84.  Plaintiff's suspension

amounted to discrimination and harassment.  Id. at ¶ 85.  The arbitration decision, finalized

on May 16, 2019, found that DPS did not have just cause to suspend Plaintiff, but did have

just cause to discipline Plaintiff for using racially discriminatory terms.  Id.  Plaintiff disputes

the arbitrator's finding that she engaged in discriminatory conduct.  Id. at ¶¶ 88-91.  Plaintiff

claims that she faced criticism for conduct that simply reflected Ukrainian culture; when

Plaintiff refused to shake hands with an administrator, for instance, she reflected a

12

Ukrainian custom, not an attempt to offend anyone.  Id. at ¶ 91.  Plaintiff is especially

troubled to be accused of racism.  Id. at ¶ 92.  Indeed, she claims, saying the word "black"

to refer to people in Russian is more offense than the word she used.  Id. at ¶¶ 97-100.

Plaintiff's Complaint claims to bring one cause of action, but lists several different

claims within that single cause.  She brings a clam pursuant to 42 U.S.C. § 1983 for

violations of First, Fifth, and Fourteenth Amendment rights.  She also alleges a violation of

Title VII of the Civil Rights Act of 1964, as well claims under New York Law.

Defendants have filed a motion to dismiss, and the parties have briefed the issues.

The matter is ripe for disposition.

## II.    LEGAL STANDARD

Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(5) for

failure of service and Rule 12(b)(6) for failure to state a claim upon which relief could be

granted.

### A.    Lack of Service

Federal Rule of Civil Procedure 12(b)(5) permits a defendant to move to dismiss a

complaint for "insufficient service of process."  Fed. R. Civ. P. 12(b)(5).  "'Where a Court is

asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues

before considering whether a claim is stated in the complaint.'" Koulkina v. City of New

York, 559 F.Supp. 2d 300, 310 (S.D.N.Y. 2006) (quoting Sunrise Indus. Joint Venture v.

Ditric Optics, Inc., 873 F.Supp. 765, 769 (E.D.N.Y. 1995)).  When a court considers

whether a complaint has been served as required by the federal rules, the court "'must look

to matters outside the complaint to determine whether it has jurisdiction.'" Id. at 311

13

(quoting Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F.Supp.2d 382, 387

(S.D.N.Y. 2002)).  "'Conclusory statements that a defendant was properly served are

insufficient to overcome a defendant's sworn affidavit that he was never served with

process.'"  Mende v. Milestone Tech., Inc., 269 F.Supp.2d 246, 251 (S.D.N.Y. 2003)

(quoting Howard v. Klynveld Peat Marwick Goerdeler, 977 F.Supp. 654, 658 (S.D.N.Y.

1997).  The plaintiff has the burden to prove adequate service when challenged.  Id. (citing

Preston v. New York, 223 F.Supp.2d 452, 466 (S.D.N.Y. 2002); see also, Burda Media,

Inc. v. Viertel, 417 F.3d 292, 298 (2d Cir. 2005)).

## B.    Failure to State a Claim

Defendants have filed a motion to dismiss Plaintiffs' claims pursuant to Federal Rule

of Civil Procedure 12(b)(6).  Defendants argue that Plaintiff has not stated a claim upon

which relief could be granted, even if all factual allegations in the complaint were proved

true.  In addressing such motions, the Court must accept "all factual allegations in the

complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v.

Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal

conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."

Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting

Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).  When, as here, the Plaintiff proceeds *pro*

*se*, the Court must "'construe [the complaint] broadly, and interpret [it] to raise the strongest

arguments that [it] suggests.'"  Weixel v. Bd. of Educ. of N.Y., 287 F.3d 138, 146 (2d Cir.

14

2002) (quoting <u>Cruz v. Gomez</u>, 202 F.3d 593, 597 (2d Cir. 2000)).

## III. ANALYSIS

Defendants raise a number of grounds in their motion, which the Court will address in turn.[1]

### A. Claims Previously Dismissed With Prejudice

In dismissing the Plaintiff's Amended Complaint, the Court determined that the motion should be "granted without prejudice to Plaintiff filing Title VII claims against her employer and to any First Amendment claims raised with respect to Defendants Stout and Scherer, who were not served.  The motion is granted with prejudice with respect to Plaintiff's other claims."  Dkt. # 34 at 28.  The Court also permitted Plaintiff to re-plead state-law claims brought pursuant to Executive Law § 296, as those claims are judged by the same standards as Title VII claims.  The claims dismissed with prejudice were any Section 1983 claims brought against state agencies, which enjoy sovereign immunity, any Title VII claims against individual defendants, any claims brought pursuant to the Fifth and Fourteenth Amendments, and any state-law claims brought pursuant to Civil Service Law § 75-b or common-law defamation.

Plaintiff's Second Amended Complaint attempts to raise claims the Court dismissed

---

[1]Defendants argue that the Court should strike plaintiff's brief as over-long.  Even were the Court to strike the brief, the Court would still consider the merits of the motion.  "No response [is] necessary" to a 12(b)(6) motion to dismiss, and the Court applies the appropriate legal standard ands determines whether the complaint states a claim upon which relief could be granted.  <u>Maggette v. Dalsheim</u>, 709 F.2d 800, 802 (2d Cir. 1983).  Here, taking into account that Plaintiff proceeds *pro se*, the Court will consider the brief as if it contained a motion for leave to file additional pages.  That permits the Court to consider the motion on the merits and with an eye to Plaintiff's position without wasting judicial resources.  If the Court struck the brief, the Court would provide Plaintiff with time to conform to the rules in her briefing, which would delay the matter unnecessarily.

with prejudice, including Section 1983 claims against the State of New York and state entities, Title VII claims against individual defendants, and state-law defamation and Civil Service Law § 75(b) claims.  The Court dismissed those claims with prejudice, meaning that Plaintiff cannot re-plead them here.  The Court will dismiss those claims for the reasons stated in the Court's previous order.

### B.    Service For Defendants Stout and Scherer

Defendants first contend that Plaintiff has not served Defendants Stout and Scherer as required by Federal Rule of Civil Procedure 4(c).  Because of this lack of service, Defendants claim, the Court has not acquired personal jurisdiction over those Defendants, and must dismiss the Second Amended Complaint as to them.  Plaintiff disputes that she has failed to serve the Defendants. The Court granted a very similar portion of Defendants' motion to dismiss the Amended Complaint.

Defendants Stout and Scherer provide sworn declarations regarding service. Defendant Doris Stout's Declaration, dkt. # 54-2, avers that she was employed by DPS as Director of the Office of Accounting Audits and Finance from 2009 until she retired on June 1, 2021.  Id. at ¶ 1.  Stout describes Plaintiff's attempts to serve the Amended Complaint on her, and relates that this Court deemed service improper and dismissed the Amended Complaint against Stout on August 11, 2021.  Id. at ¶ 10.  Stout notes that the Court permitted service of the Second Amended Complaint on her.  Id.  Plaintiff filed her Second Amended Complaint on September 10, 2021.  Id. at ¶ 11.  Stout reports that Plaintiff never personally served her with the Second Amended Complaint.  Id. at ¶ 12.  Stout also never received a copy of a summons and the Second Amended Complaint by mail at her residence, nor did she receive such documents at her actual place of business.  Id. at ¶¶

16

13-14.  In the end, Stout claims, "Plaintiff never served me with a copy of the Summons and Amended Complaint or Second Amended Complaint, as required by" the Federal Rules of Civil Procedure.  Id. at ¶ 15.

John Scherer relates that he served as Deputy Director of the OAAF from 2013 until he retired on December 30, 2020.  Declaration of John Scherer, dkt. # 54-3, at ¶ 1.  His place of business when he worked at OAAF was Agency Building 3, Empire State Plaza, Albany, New York 12223-1350.  Id. at ¶ 4.  Scherer relates the procedural history of the case, Plaintiff's failure to serve him with the Amended Complaint, and the Court's decision dismissing the Amended Complaint against him for failure-to-serve.  Id. at ¶¶ 6-10.  He further relates that the Court granted Plaintiff permission to file a Second Amended Complaint and to serve that Second Amended Complaint against him.  Id. at ¶ 10.  Scherer avers that Plaintiff did not serve him personally with the Second Amended Complaint, nor did he receive a summons and Second Amended Complaint by mail or have those documents mailed to his work address.  Id. at ¶¶ 12-14.  As with Stout, Scherer claims that Plaintiff has never properly served him with a copy of either the Amended Complaint or the Second Amended Complaint.

In dismissing the Amended Complaint for failure to serve several Defendants, the Court found:

> Plaintiff filed affidavits of service of the summons and Amended Complaint on each of the moving Defendants.  Those affidavits indicated that the process server delivered the summons and Amended Complaint to 8 Golden Eagle Ct., Brunswick, NY, leaving them with John Graham, an assistant attorney, "a person of suitable age and discretion who agreed to accept on behalf of the party."  See dkt. #s 14-4 (Christine F. Balleau); 14-5 (John Scherer); dkt. # 14-6 (Doris Stout); 14-7 (Thomas Congdon).  Plaintiff also provided affidavits of service by mail.  These documents indicated that Plaintiff served the moving defendants "by depositing a copy of the aforementioned documents in a postpaid, properly addressed envelope, the address

17

for the recipient being: 8 Golden Eagle Ct., Brunswick, NY." See dkt. #s 15-3 (Thoms Congdon); dkt. # 15-4 (Christine F. Balleau); dkt. # 15-5 (John Scherer); dkt. # 15-6 (Doris D. Stout). Those affidavits indicated that mailings were directed "C/O Asst. Counsel John Graham." Id.

"[Federal] Rule [of Civil Procedure] 4(e) generally provides that individuals may be served by either (1) following the relevant state law procedures for service of the State where the district court is located or where service is made, or (2) personal delivery, leaving a copy at the individual's dwelling or usual abode with a person who resides there, or delivering a copy to an agent authorized to receive process." Vidurek v. Koskinen, 789 Fed. Appx. 889, 893 (2d Cir. 2019) (citing FED. R. CIV. P. 4(e)). New York law provides several ways by which an individual can be served. New York permits service "by delivering the summons within the state to the person to be served." NY CPLR § 308(1). A person may also be served "by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business[.]" NY CPLR § 308(2). New York also allows service "by delivering the summons within the state to the agent for service of the person to be served as designated under rule 318[.]" NY CPLR § 308(3). Section 318 provides that "[a] person may be designated by a natural person, corporation or partnership as an agent for service in a writing, executed and acknowledged in the same manner as a deed, with the consent of the agent endorsed thereon." NY CPLR § 318.

The Court finds that Plaintiff has not met her burden to show that service was adequate for these Defendants in their individual capacities. There is no dispute that they were not personally served. While an agent did deliver the documents to an address and leave them with a person, that address was not the home of any of the Defendants. Plaintiff has provided no evidence that John Graham was the agent for service of any of the Defendants. Plaintiff thus has failed to meet her burden with respect to Federal Rule of Civil Procedure 4(e)(2).[2] Plaintiff could also serve her Amended Complaint by following New York law. See Fed. R. Civ. P.

---

[2]A person may be served in any judicial district in the United States by:
(2) doing any of the following:
> (A) delivering a copy of the summons and of the complaint to the individual personally;
> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
> (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e)(2).

> 4(e)(1).  She has not met her burden in this respect.  She did not deliver the
> summons and complaint to Defendants' place of business, nor did she mail those
> documents to Defendants' last known residence.  She likewise has not shown that
> Graham was the agent for service of any of these individuals.

Dkt. # 34 at 14-17.

In opposing the Defendants' motion in this respect, Plaintiff repeats the arguments she made previously and relies on the same proofs of service she provided earlier.[3]  She does not provide any proof of service for these Defendants.  She has not cured the problems with service the Court identified previously, and the Court will grant the motion of Defendant Stout and Defendant Scherer for the same reasons as stated previously and dismiss any claims against Scherer and Stout.[4]

**C.    Title VII**

Defendants seek dismissal of Plaintiff's Title VII claims on various grounds.  The Court will address them in turn, as appropriate.

---

[3]Plaintiff's response might be read as a request for reconsideration of the Court's earlier decision granting Defendants' motion with respect to failure to serve.  If that were the case, the Court would deny Plaintiff's motion.  When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked–matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., 70 F.3d 255, 257 (2d Cir. 1995).  Such a motion is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking 'a second bite at the apple[.]'" Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 41 (2d Cir. 2012) (quoting Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998)).  Plaintiff simply repeats an argument the Court has rejected.

[4]The only conceivable claim remaining against these two Defendants is a First Amendment retaliation claim.  As Plaintiff has named Defendants who have been served on the First Amendment claim, the Court will address that issue.  Because the Court will dismiss that First Amendment claim with prejudice with respect to the Defendants actually served on the basis that Plaintiff did not speak on a matter of public concern, the Court will dismiss the claim against Scherer and Stout with prejudice too.

Defendants first argue that Plaintiff failed to file a timely discrimination charge with the appropriate administrative agency, and is therefore barred from bringing a claim. They argue that Plaintiff filed a discrimination charge with the EEOC on or about September 30, 2019.[5]  Because a claim must be filed within three hundred days of the discriminatory act, Defendants argue that Plaintiff's claims are untimely if the acts complained of occurred December 4, 2018.

In general, "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e-5(e)(1)." Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir. 2004).   The time for filing charges under that statute is 300 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).   Not every act giving rise to a discrimination claim, however, need have occurred within the 300-day time limit proscribed by the statute: "'[u]nder the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.'"  Patterson, 375 F.3d at 220 (quoting Lambert v. Genesee Hospital, 10 F.3d 46, 53 (2d Cir. 1993).  To take advantage of the

---

[5]Plaintiff's Second Amended Complaint claims that she filed EEOC charges on September 30, 2019.  Second Amended Complt. at ¶ 114.  She allegedly received a right-to-sue letter on January 17, 2020.  Id. at ¶ 115.  The Second Amended Complaint does not contain a copy of either document.  The original Complaint contained a copy of the right-to-sue letter, dated January 17, 2020.  See dkt. # 1.  That letter provided that "You allege that you were targeted and suspended for complaining about discrimination and given a mediocre performance evaluation in retaliation for complaining about discrimination and given a mediocre performance evaluation in retaliation for complaining and because of your national origin/Ukrainian and your age over 40."  Id.  Plaintiff does not here raise an age-discrimination complaint.

continuing violations exception, "a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period." Patterson, 375 F.3d at 220.  A plaintiff may not recover, however, "'for *discrete* acts of discrimination or retaliation that occur outside the statutory time period,' even if other acts of discrimination occurred within the statutory time period."  Id. (quoting AMTRAK v. Morgan, 536 U.S. 101, 105 (2002) (emphasis added in original)).

Plaintiff appears to agree that she filed her discrimination claim on September 30, 2019, and that she would have to have alleged a discriminatory act that occurred after December 4, 2018 to meet the statute of limitations.  She argues, however, that she has met this deadline.  She points to the arbitration process, which concluded with a decision on March 25, 2019, as an act of discrimination that fits the statute of limitations.[6]  She contends that the process and decision "demonstrate the depth of misunderstanding of Anti-Discrimination Law in New York State agencies and legal organizations[.]" Plaintiff's argument here is unpersuasive, however.  Courts have concluded that "'the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods.'" Cherry v. City of New York, 381 Fed. Appx. 57, 59 (2d Cir. 2010) (quoting Del. State Coll. v. Ricks, 449 U.S. 250, 261 (1980)).  Thus, Plaintiff has not pointed to any discriminatory act that occurred within the statute of

---

[6]Defendants argue that, to the extent that Plaintiff seeks to challenge the arbitrator's May 16, 2019 decision that led to a five-day suspension, Plaintiff had to make such a claim within 90 days and pursuant to New York Civil Procedure Laws and Rules Article 75. See NY CPLR §§ 7502, 7511(a).  She did not do so, and cannot do so here, they argue. Defendants appear to be correct that, to the extent that Plaintiff seeks to challenge the arbitrator's award, she failed to meet the time requirements.  New York law provides that "[a]n application to vacate or modify an [arbitration] award may be made by a party within ninety days after its delivery to him."  NY CPLR § 7511(a).

limitations, and the Court will grant the motion in this respect.[7]

Even if the Plaintiff had satisfied the 300-day statute of limitations, the Court would find that she had failed to state a claim that would entitle her to relief.  At this stage of the litigation, a plausible Title VII claim requires that a plaintiff allege:  "(1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation[.]"  Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis in original).   As related above, Plaintiff's Second Amended Complaint contains two types of allegations of adverse employment actions.  One set of allegations concerns her employer's unwillingness to take her suggestions about improving work process and efficiency, the poor evaluations she suffered as a result of her suggestions, and the damage to her prospects for promotion and advancement that followed those poor evaluations.  Plaintiff's Second Amended Complaint does not offer even minimal allegations that would permit an inference that her poor evaluations were a result of a discriminatory intent based on any protected characteristic.  Without such allegations, Plaintiff has failed to state a claim.  The Second Amended Complaint also focuses on Plaintiff's allegations concerning Shang and Defendants' response to Plaintiff's complaints about Shang.  The Second Amended

---

[7]The facts recited above do include one event that occurred in the relevant time period, though Plaintiff does not point to it in her argument.  The Court would not have been persuaded that she pointed to an act of discrimination if she had.  Plaintiff points to an e-mail she received from Christine Balleau when she returned to work on June 17, 2019 that stated that "'Employees may use foreign language to communicate in the workplace if it doesn't exclude other appropriate parties from the discussion.'"  Id. Cmplt. at ¶ 44.  Plaintiff appears to allege that such conduct amounted to discrimination aimed at her because she had complained about her coworkers not speaking English in the office.

Complaint also implies that past poor evaluations came in response to Plaintiff's criticism about Shang.  None of these allegations amount to claims of mistreatment because of Plaintiff's ethnic origins.  Instead, Plaintiff alleges that disagreements occurred between Plaintiff and another worker that involved each person's ethic identity, and that their employer attempted to mediate.  Plaintiff's complaint is that the employer did not take her side.

Plaintiff particularly complains that she was punished for using a Russian word in a meeting that Defendants misinterpreted as offensive, and that they permitted the use of a language other than English in the workplace.  None of the facts suggest, even minimally, an inference of discriminatory motivation.  At worst, they suggest a misunderstanding by the Defendants of Plaintiff's intentions and a disagreement about whether speaking something other than English was appropriate in the workplace.  Plaintiff does not suggest that Defendants discriminated against her when they permitted her (and others) to speak a language with which they were comfortable.   She also admits that Defendants punished her when she spoke words they considered discriminatory.  Under those circumstances, the Court cannot find a plausible allegation that would permit an inference of discriminatory intent.  Even if Plaintiff had met the statute of limitations, the Court would grant the motion with respect to the Title VII claims.

> **D.    First Amendment**

Defendants next seek dismissal of any claims Plaintiff brings pursuant to the First Amendment.  They argue that Plaintiff has failed to allege that she spoke as a citizen on a matter of public concern, and therefore cannot make out a claim. Plaintiff contends that Defendants violated her First Amendment rights by disciplining her after she spoke on

23

matters of public concern.

"The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  "The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." Id. at 419.  "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  Id.

"Whether public employee speech is protected from retaliation under the First Amendment entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999).  A court is to "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."  Id. at 163-64.  "'To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political,

24

social, or other concern to the community.'" Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018)(quoting Jackler v. Byrne, 658 F.3d 225, 236 (2d Cir. 2011)).  If the "speech . . . 'primarily concerns an issue that is personal in nature and generally related to the speaker's own situation, such as his or her assignments, promotion, or salary'" then the speech "'does not address matters of public concern.'"  Id. (quoting Jackler, 658 F.3d at 236).  The speech in question might "[hint] at some broader public purpose[,]" but "retaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by 'the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern.'" Ruotolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008) (quoting Ezekwo v. New York City Health & Hosp. Corp., 940 F.2d 775, 781 (2d Cir. 1991)).  As such "'[a] public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way institutions are run.'"  Id. (quoting Boyce v. Andrew, 510 F.3d 1333, 1343 (11th Cir. 2007)).   "The speaker's motive is a factor to consider but 'is not dispositive in determining whether his speech addresses a matter of public concern.'"  Golodner v. Berliner, 770 F.3d 196, 202 (2d Cir. 2014) (quoting Sousa v. Roque, 578 F.3d 164, 173 (2d Cir. 2009)).

Plaintiff provided a chart with her response to Plaintiff's earlier motion that addresses what she contends was her speech on matters of public concern.[8]  In brief, she

---

[8]These incidents allegedly began on March 18, 2014 and continued until the date Plaintiff filed her Complaint.  See dkt. # 29-1.  The eight "events" that Plaintiff cites can be divided into two categories: her interactions with Shang and her employer's response to them in counseling sessions and a suspension; and discussions with Plaintiff's employer about Plaintiff's critique's of the employer's accounting methods and practices.  Id. Plaintiff also explains why she believes that, in speaking about these events, she spoke on

argues that the she engaged in two types of protected speech beginning in 2011.  She

contends that she complained repeatedly about Shang's speech to her and to an executive

of an audited party.  She contends she reported several times about these phone calls with

an audited party, and that her employer responded by disciplining her for complaining.

Plaintiff also alleges that, beginning in 2011, she spoke repeatedly to her employer about

improving auditing practices.  Instead of adopting her suggested changes, Defendants

instead gave her bad evaluations and prevented her promotion.

          The Court will grant the motion in this respect as well.  Even assuming that Plaintiff

has satisfied the statute of limitations for a series of events that she contends began in

2011, the Court finds that Plaintiff has not alleged that she spoke on a matter of public

concern.  Without such protected speech, Plaintiff cannot make out a First Amendment

retaliation claim. While corruption in government can be "a potential topic of public concern

. . . it does not follow that any accusation of an employer practice that is alleged to be

'corrupt' qualifies for protection."  Singer v. Ferro, 711 F.3d 334, 340 (2d Cir. 2013)).  "The

First Amendment does not protect all private ventings of disgruntled public employees.

Only that 'corruption' which constitutes 'a subject of general interest . . . to the public is

---

matters of public concern. Id.  With respect to the complaints about work practices and
methods, Plaintiff points to the benefits that would have come to the Department from her
suggestions and the waste in the Department's current practices. Id.  In terms of her
reports on Shang, Plaintiff contends that she spoke on matters of public concern by
informing the Department of "unloyal individuals from China, faking their U.S. Citizenship
but still adhering to China's government," as well as Shang's violation of confidentiality
policies and the public trust in his interactions with the audited party. Id.   Plaintiff
contends that Defendants retaliated in response to her suggestions to improve auditing.
Id.  Defendants allegedly ignored her ideas, criticized her work product, and adopted
policies worse than those suggested.  Id.  Defendants allegedly engaged in an adverse job
action due to her complaints about Shang by labeling her as the person doing the
discriminating and punishing her.

potential the object of first amendment solicitude."  Id. (quoting City of San Diego v. Roe, 543 U.S. 77, 84 (2004)).

The speech cited by the Plaintiff and described in her complaint concerns workplace disagreements and conflicts, not matters of concern to the general public.  She has not alleged any corruption that would be of a general interest to the public.  Such workplace concerns do not implicate the First Amendment.  In terms of Plaintiff's speech about auditing methods, such disputes about the way to perform work are not matters of public concern.  Plaintiff's speech about Shang does not qualify either.  In terms of Shang's personal conversations with the Plaintiff, complaints about such harassing conduct are workplace issues, not matters of public concern.  Likewise, complaints that Shang spoke in a language other than English at work are workplace issues, not matters of public concern, even if Plaintiff argues that Defendants did not follow their own policies.  Even though Plaintiff attempts to create a matter of public concern by suggesting that she reported that Shang had engaged in corruption, Plaintiff alleges only that Shang had a friendly relationship in a foreign language with an audited party, and that his speaking in a foreign language to that executive violated workplace rules.  Management violated its own rules, she alleges, by failing to enforce a requirement that Shang speak English when she raised the issue.  Plaintiff's complaint, then, is that Defendants did not punish Chang for not speaking English, not that Defendants punished her for reporting something specific that Chang said that concerned the public.  She has not stated a claim that she spoke on a matter of public concern.[9]

_____

[9]The Court also rejects Plaintiff's arguments that she spoke on a matter of public concern when she opposed being disciplined for using a Russian word that sounds like a

Because Plaintiff has not alleged she spoke on a matter of public concern, the Court will grant the motion in this respect as well.

### E.   Executive Law § 296

Defendants argue that the Court should dismiss Plaintiff's claims under Executive Law § 296.  They contend that the standard for evaluating such claims is the same as Title VII claims.  Since the Court should dismiss those claims, the Court should also dismiss any state-law claims.  In the alternative, the Defendants argue that the Court should decline to exercise supplemental jurisdiction over such claims.

"Unlike Title VII's 300-day rule, the statute of limitations for actions under New York's Human Rights Law is three years."  Van Zandt v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996).  Though the time limits are different, the standard for such claims are "essentially identical." Id.  (quotation removed from original).   "'New York courts require the same standard of proof for claims brought under the [Human Rights Law] as those brought under Title VII.'" Id. at 715 (quoting Tomka v. Seiler Corp., 66 F3d 1295, 1304 (2d Cir. 1995)).

Here, the Court has found that Plaintiff has failed to allege discrimination under Title

---

racially offensive English word. She argues that the Russian word is inoffensive and should acceptable in public.  Using that word, she claims, would help Americans focus less on people's color and thus avoid segregation and racism.  Plaintiff does not allege that she made this specific argument to her supervisors.  The facts alleged in the Complaint make clear that she used a word supervisors found offensive during a meeting, and that led to discipline.  Plaintiff's briefing attempts to transform a workplace concern into a matter of public concern, and fails.  Likewise, Plaintiff's citation to public statement about the Defendant Department's public service mission and the importance of integrity to that mission do not address whether Plaintiff spoke on a matter of public concern.

VII, and the Court will therefore grant the motion in this respect as well.[10]

## IV.   CONCLUSION

For the reasons stated above, the Defendant's motion to dismiss, dkt. # 54, is

hereby GRANTED with prejudice. The Clerk of Court is hereby directed to CLOSE the

case.

**IT IS SO ORDERED**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: September 12, 2022

---

[10]Defendants filed supplemental briefing seeking dismissal for the individual
Defendants on two other bases.  First, they argue that any official capacity claims for
money damages against the three individual defendants brought pursuant to Section 1983
are barred by the doctrine of sovereign immunity.  The Court agrees, and, if any Section
1983 claims remained, would dismiss any claims brought against the individual
Defendants in their official capacities.  See, e.g., Al-Jundi v. Estate of Rockefeller, 885
F.2d 1060, 1065 n.2 (2d Cir. 1989) ("Because a suit against [an] official in his or her
official capacity 'is no different from a suit against the State itself,' damages can only be
obtained when the official is sued in his or her personal capacity.") (quoting Edelman v.
Jordan, 651, 663 (1974)).  Plaintiff also seeks dismissal of any claims brought pursuant to
Title VII against Defendant Canty, as that statute does not permit claims against an
individual.  The Court again agrees, and would grant the motion in that respect if Plaintiff
had pled a plausible Title VII claim.  See, e,g., Tolbert v. Smith, 790 F.3d 427, 435 n. 3
(Title VII does not provide for individual liability).